## HARRELL v. CANE GROWERS CO-OPERATIVE ASSOCIATION.

PER CURIAM. 1. The title of the co-operative marketing act (Acts 1921, p. 139) is sufficiently broad to include the provisions of sections 3, 4, 5, 15, and 23 of said act; and for that reason said sections are not void as in violation of article 3, section 7, paragraph 8, of the constitution of Georgia.

2. So much of section 15 of the acts of 1921, referred to in the preceding division, as seeks to authorize the by-laws and marketing contract to fix liquidated damages and to require the members to pay all costs, premiums for bonds, expenses and fees, as well as providing for injunction and a decree of specific performance, is not unconstitutional and void as being in conflict with article 1, section 4, paragraph 1, of the constitution of Georgia, in that the general laws of the State have provided for the issuing of temporary injunction, for the payment of court costs, and other provisions stated in said section.

3. An attack upon the entire act of the legislature mentioned in the preceding division, and upon the contract upon which the suit was based, on the ground that they are null and void as being "in violation of article 4, section 1, paragraph 4, of the constitution, in that it was the intention of the plaintiff and the members forming the same to combine all of the cane products grown in southwest Georgia so as to be able to fix the price at which the cane would be sold, and be able to effect a corner of the syrup manufactured in southwest Georgia, so as to enable the association to dictate the price to be paid for such syrup by the canners who depended upon said crop for their material to operate their canneries," is insufficient to present any question for consideration, there being no section 1 in article 4 of the constitution.

*Judgment affirmed. All the Justices concur, except Gilbert, J., absent for providential cause.*

No. 4171. FEBRUARY 27, 1925.

Injunction. Before Judge Custer. Grady superior court. December 1, 1923.

The Cane Growers Co-Operative Association filed a petition against Guy Harrell, alleging that he had broken a contract by which he agreed to sell the association all the syrup made by him in the years 1922, 1923, 1924, 1925, and 1926, by selling ten barrels of syrup in violation of the contract. The petition prayed that the defendant be required to specifically perform the contract except as to the portion of the syrup which had been sold, and that he be enjoined from any further violation of the contract. A copy of the contract was attached to the petition, as follows:

"Farmers' Co-Operative Cane Syrup Association. Offices: Cairo, Georgia.

"We organize a non-profit co-operative association to sell our syrup intelligently.—The undersigned propose to organize a non-profit association, without capital stock, under the laws of the State of Georgia, for the purpose of promoting, fostering, and encouraging the business of marketing syrup co-operatively; for stabilizing markets; for co-operatively and collectively handling the problems of syrup growers and for other purposes. We agree with each other.—No outsiders in this contract.—We, the undersigned, in consideration of the premises, and of our mutual undertaking, and of the agreement of each and every party hereto, do hereby agree as follows, each for himself, and collectively for the express benefit of and as the association to be organized:

"We agree to be members.—1. We will become members of the Farmers' Co-Operative Cane Syrup Association, a non-profit association without capital stock, to be organized under the laws of the State of Georgia. Only growers or landlords who have syrup to sell can be members.—2. The association may include in its membership any syrup grower or the landlord or tenant or lessor of land in Georgia on which cane is grown, provided the landlord or lessor receives all or part of the rental in syrup. Will have five directors.—The office will be at Cairo, Georgia.—3. The affairs of the association will be controlled by a board of five directors, and the office of the association shall be at Cairo, Ga. Five directors are cane growers.—4. There will be five districts.—(a) The members shall elect five directors from among

members actually residing and growing cane in five districts, to be specified by the organization committee prior to the first primary elections, including in each district approximately one-fifth of the cane covered by the signers, without dividing counties. Members shall hold primary elections to choose directors in each district.—5. The members of each district shall meet annually for a primary election, to be held in the district and conducted as, where, and when specified by the directors, and shall select one name in each district to be presented as the nominee to repr. each district. Such nominees shall be elected as director the general meeting. Voting By Mail.—If unable to attend, the members may vote at such primary meeting by mail, on ballot prepared under direction of the Board of Directors. The first primary to select incorporating directors shall be held within thirty days after the minimum sign-up has been secured, as the organization committee shall direct. Districts always to be given fair representation.—6. The directors, by a majority vote, at least twenty days prior to the primary meetings, each year thereafter, shall change the said districts and the counties included therein, so as to maintain at all times fair and equitable representation of the cane-producing counties and districts included in the membership. Board will have an executive committee.— (b) All officers and employees of the association who handle funds shall be adequately bonded. One man, one vote.—Every member of the association shall have one vote.

"Membership fee, three dollars.—Every member shall pay an entrance or membership fee of $3.00, associate members $5.00, payable as, how, and when the organization committee may determine.

"Association will have suitable articles of incorporation and by-laws.—The association shall confine itself to the problems and marketing of cane and cane products only and for its members only. It shall have suitable articles of incorporation and by-laws stating the purposes and powers of the association, the rights and duties of members, manner of forfeiture of membership, value of property interests on withdrawal or expulsion from membership, and any other necessary, pertinent or important points of organization, as determined by the organization committee.

"Organization committee.—The association shall be organized by an organization committee of eighteen members, which may

increase its members, select its own chairman, vice-chairman, secretary and treasurer, and generally take such steps as it may deem advisable to secure subscribers for this agreement and the members of the association.  T. M. Chastain, Chairman, Cairo, Ga.; S. P. Vanlandingham, Cairo, Ga.; Charles Whitfield, Calvary, Ga.; B. L. Hudson, Ochlocknee, Ga.; H. W. Griffin, Ochlocknee, Ga.; M. M. Blanton, Valdosta, Ga.; W. C. Lineberger, Valdosta, Ga.; S. R. Swilley, Quitman, Ga.; J. I. Bruce, Dixie, Ga.

by May 1st, 1922, signatures of cane-growers or persons ble to membership covering at least twenty-five per cent. of the 1920 crop shall not have been secured for this agreement, the organization committee shall so notify every subscriber at his address noted below, prior to May 15th, 1922, and cancel his signature and the agreement signed by him.

"Binding agreement.—If signatures of the growers of twenty-five per cent. of the syrup produced in the above-named counties shall be secured by the said date, May 1st, 1922, then this agreement shall be binding upon all the subscribers in all of its terms, and there shall be no right of withdrawal whatsoever.  Starts with the 1921 crop, if sign-up secured.—If the signatures of twenty-five per cent. of the crop shall be secured by November 15, 1921, this contract shall go into effect at once and shall be binding upon the subscribers as to the 1921 crop in addition to those set forth in the Marketing Agreement.  Statement of committee conclusive.—For all matters of production or signatures and for all statements of fact in connection herewith, the written statement of the organization committee, signed by its chairman, shall be absolutely conclusive, with or without notice to the subscriber.

"Committee keeps full accounts.—The organization committee shall keep a full, true, and detailed account of expenditures, including salaries, fees, and costs of every kind; and shall render a written report thereof to the board of directors of the association when organized; and shall thereupon turn over to the association any balance remaining in its hands and free of obligation. Treasurer bonded.—The treasurer of the committee shall be bonded.

"Funds, prorate if sign-up not secured.—If the signatures covering twenty-five per cent. of the syrup produced in the county herein specified shall not have been secured by May 1st, 1922, the

funds on hand shall be prorated among the subscribers, after payment of all debts; and the accounts shall be audited by a public accountant and the report be made available for inspection by all subscribers.

"Committee authorized to go ahead.—We do hereby authorize the organization committee, as the representative of all the subscribers, to take such steps as it may deem proper to secure subscribers hereto; and when the adequate number is secured, to hold primary elections and have the signers select organizing directors from among growers subscribing hereto, and to take all steps necessary and advisable to organize the association. .

"Keep up organization work.—The association when organized shall make every reasonable effort to secure signatures of additional growers to the standard marketing agreement, to cover the largest possible percentage of the cane of this State.

"Warehousing.—After due investigation the association may cause a refining and canning corporation to be organized to handle, treat, process, warehouse or store any or all of the syrup delivered by members of the association. Appropriate name.— Such corporation shall have an appropriate name, and shall have common capital stock and preferred capital stock in amounts estimated as sufficient for their purposes by the directors of the association. Voting power in common stock.—Only members can own this.—The authorized common stock shall exceed in amount the authorized preferred stock. The common stock shall be sold or issued only to the members of the association at par. The common stock shall have all the voting power of the corporation. Preferred stock has no vote, but has guaranteed dividends.—Anybody can buy this.—The preferred stock shall be divided into five equal classes, all bearing eight per cent. cumulative dividends and having similar preferences, subject to retirement with a bonus of two per cent. at the rate of one class or one-fifty thereof annually, beginning with December, 1922. The preferred stock may be sold to any person, firm, or corporation whatsoever. Limitation on stock issues.—The original issue of preferred stock shall not exceed one dollar for each barrel of syrup of the 1920 crop, covered by the membership of that district; but this amount may be increased proportionally as the membership increases.

"Function of corporation and relations to marketing organizations.—The association shall make a cross-contract with the cor-

poration, providing substantially as follows: That the corporation shall handle,. treat, process, store, ship and deliver, all as required and directed by the association, the syrup delivered to it and at the order of the association. Such service will be on a non-profit basis; and the corporation shall receive therefor only the actual costs of such operations and amounts apportioned over the operation of any one season, sufficient to pay a dividend of eight per cent. on the outstanding common stock and the dividends on the outstanding preferred stock and to retire the preferred stock, or one class thereof; and sufficient amounts for taxes, insurance, depreciation, betterments, and commercial and secondary charges, all as the directors of the association may instruct and limit the · corporation, and not otherwise.

"How you retire preferred stock.—The association shall retire each class of preferred stock and pay the dividends on the stock by deductions from the syrup of the members within the respective district.

"Growers get credit for all deductions to retire stock.—As the preferred stock is retired, the association will calculate the value of the contribution from the proceeds of each grower's syrup toward such retirement and towards the payment of dividends on the common and preferred stock, and the corporation will credit and issue from time to time each member common stock in an equivalent amount at the par value thereof, as soon as the aggregate deductions equal the value of one or more shares.

"Marketing agreement is here accepted.—The subscriber agrees, first, to execute, when requested by the association, a marketing agreement in terms substantially the same as those set forth in the agreement herewith embodied; or, second, at the option of the board of directors, to be bound by the terms of the following marketing agreement: For such purpose signature to this association contract shall be deemed to all effects the same as signature to this marketing agreement as acceptance of each and every provision thereof and herein, as of the exercise of the option by the board of directors. Notice thereof shall be mailed to each subscriber at his address as noted below.

"This is an application for membership.—The subscriber here applies for membership in the association, when organized, and expressly agrees that his signature to the association contract and to the marketing agreement herewith embodied, and to this ap-

plication for membership, shall be irrevocable, except as provided in paragraph 18, and that he so agrees, in order to induce other growers to sign this agreement for his benefit as well as their own general benefit and the public welfare. Acceptance of this application for membership and of the marketing agreement shall be deemed conclusive, upon the mailing of the notice by the association; and such mailing and notice shall be conclusively established by the affidavit of the Secretary of the Association.

"Member's agreement with association.—The Farmers' Cane Syrup Co-Operative Association, a non-profit association with its principal office at Cairo, hereinafter called the association, first party, and the undersigned grower, second party, agrees:

"This is for co-operative marketing.—1. The grower is a member of the association and is helping to carry out the express aims of the association for co-operative marketing, for minimizing waste, and for stabilizing syrup markets in the interest of the grower and the public, through this and similar organizations undertaken by other growers.

"Grower sells syrup to association for five years.—2. The association agrees to buy and the grower agrees to sell and deliver to the association all of the syrup produced [by?] or for him in Georgia during the years 1922, 1923, 1924, 1925, and 1926. Also 1921 in the event that this contract shall have obtained the requisite number of signatures by November 15th, 1921, to make it effective.

"If you have a crop mortgage.—3. That syrup does not have to go to the association.—The grower expressly warrants that he has not heretofore contracted to sell, market, or deliver any of his said syrup to any person, firm, or corporation, except as noted at the end of this agreement. Any syrup covered by such existing contract or crop mortgage shall be excluded from the terms hereof for the period and to the extent noted, if the lienholder so enforces his right to possession.

"The association tells you where to deliver.—4. (1) All syrup shall be delivered at the earliest possible time after manufacturing, to the order of the association, at the warehouse, if the association controls a warehouse in that immediate district; or by shipment as directed to the association and by delivery of the indorsed warehouse receipts or bills of lading properly directed.

"Poor syrup is penalized.—(b) Any deduction or allowance

or loss that the association may make or suffer on account of inferior grade, quality, or condition at delivery, shall be charged against the grower individually.

"The association will try to standardize methods.— (c) The association shall make rules and regulations to standardize, grade, and class the quality of and the method and manner of handling syrup, and the grower agrees to observe and perform any such rules and regulations and accept the grading of the association.

"All syrup will be pooled for each year by type and grade.—5. The association shall pool or mingle the syrup of the grower with syrup of a like variety, grade, and quality delivered by other growers. The association shall classify the syrup and its classification shall be conclusive. Each pool shall be for a full season.

"Association will resell all syrup and pay net proceeds to grower. —Cost of operation and overhead will be deducted. But the association is forbidden to make any profit for itself.—6. The association agrees to resell such syrup together with syrup of like variety, grade, and quality, delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions; and to pay over the net amount received therefrom (less freight, insurance, and interest) as payment in full to the grower and growers named in contracts similar hereto, according to the syrup delivered by each of them, after deducting therefrom, within the discretion of the association, the cost of handling, grading, and marketing such syrup and of reserves for credit and other general purposes (said reserves not to exceed two per cent. of the gross resale price). The annual surplus from such deductions must be prorated among the growers delivering syrup in that year on the basis of delivery.

"Every grower gets the same price for like type and grade of syrup.—7. The grower agrees that the association may handle, in its discretion, some of the syrup in one way and some in another; but the net proceeds of all syrup of like quality, less charge, costs, and advance shall be divided ratably among the growers in proportion to their deliveries to each pool, payments to be made from time to time until all the accounts of each pool are settled.

"The syrup will be sold anywhere.—For export or otherwise, where most profitable.—8. The association may sell the said syrup, within or without this State, directly to consumers, brokers,

or otherwise, at such times and upon such conditions and terms as it may deem profitable, fair and advantageous to the growers; and it may sell all or any part of the syrup to or through any agency, now established or to be hereafter established, for the cooperative marketing of the syrup of growers in other States throughout the United States, under such conditions as will serve the joint interest of the growers and the public; and any proportionate expense connected therewith shall be deemed marketing costs under paragraph 6.

"The association can raise money to make first payment to grower.—9. The grower agrees that the association shall borrow money in its name on the syrup, by the issuance of commodity bonds or bearer certificates or through drafts, acceptances, notes, or otherwise, on any warehouse receipt or bills of lading, or upon any accounts for the sale of syrup or on any commercial paper delivered therefor. The association shall prorate the money so received among the growers equitably, as it may determine, for each district and period of deliveries.

"The association agrees to accept drafts drawn against it by the grower for any amount specified and determined by it, upon delivery of syrup hereunder, and to assist the grower to discount such drafts, secured by the warehouse receipts, through the most advantageous banking system.

"Offices or plants wherever they are needed.—10. The association may establish selling offices, warehouses, plants, marketing, statistical, or other agencies in any place.

"You can stop growing cane if you wish.—11. The grower shall have the right to stop growing cane, and to grow anything else at any time at his free discretion; but if he produces any syrup during the term hereof, it shall all be included under the terms of this agreement and must be sold to the association, except what is consumed by the grower. You do not have to deliver any particular amount.—12. Nothing in this agreement shall be interpreted as compelling the grower to deliver any specified quantity of syrup per year; but he shall deliver all the syrup produced or acquired by or for him. You deliver all the syrup you raise.— (a) . This agreement shall be binding upon the grower as long as he produces syrup directly or indirectly, or has the legal right to exercise control of any commercial syrup or any interest therein

during the term of this contract. (b)   If this agreement is sign-
ed by the members of a copartnership, it shall apply to them and
each of them individually in the event of the dissolution or deter-
mination of the said copartnership.

"You may make a crop mortgage.—The association will try to
help you secure standard terms.—(c)   If the grower places a crop
mortgage upon any of his crops during the term hereof, the asso-
ciation shall have the right to take delivery of his syrup and to
pay off all or part of the crop mortgages for the account of the
grower and to charge the same against him individually.   The
grower may place a crop mortgage upon his syrup, and agrees to
notify the association prior to making any mortgage; and the
association will advise the grower in any such transactions.

"Statistics are needed.—14.   From time to time the grower
agrees to mail to the association any statistical data requested on
all the forms provided for that purpose by the association.

"All contracts are alike.—15.   This agreement is one of a series
generally similar in terms, comprising with all such agreements,
signed by individual growers, or otherwise, one single contract be-
tween the association and the said growers, mutually and in-
dividually obligated under all of the terms thereof.   The associa-
tion shall be deemed to be acting in its own name; for all such
growers, in any action or legal proceedings on or arising out of
this contract.

"The grower authorizes the association to build warehouses if
it needs them.—16.   (a)   The grower hereby expressly authorizes
the association to deliver, to any warehousing corporation or-
ganized for co-operation with the association, any or all of his
syrup for handling, processing, or storing; and to charge against
his syrup the prorated costs of such services and his prorated share
of the funds necessary to create a reserve, equivalent to one class
of its preferred stock annually, plus bonus, to retire the said
class, or otherwise; and to pay the interest or advances and the
dividends on all outstanding preferred stock.

"Any old syrup may be delivered to the association to sell.—17.
If the grower has on hand when this agreement goes into effect,
any syrup of the 1921 crop or previous crops, free of liens and
capable of delivery, he shall deliver such syrup to the association
as it may direct, to be graded by the association and marketed by

it in pools wholly separated from all other deliveries here made, but generally in the manner herein above set forth.

"Do not break the contract.—This is expensive.—18. (a) Inasmuch as the remedy at law would be inadequate, and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association should the grower fail to sell and deliver all of his syrup, the grower hereby agrees to pay to the association, for all syrup delivered, sold, consigned, withheld, or marketed by or for him, other than in accordance with the terms hereof, the sum of three dollars per barrel as liquidated damages for the breach of this contract, all parties agreeing that this contract is one of a series depending for its true value upon the adherence of each and all of the growers to each and all of the said contracts.

"We will get his syrup anyway.—(b) The grower agrees that in the event of a breach or threatened breach by him of any provision regarding delivery of syrup, the association shall be entitled to an injunction to prevent the breach or further breach hereof, and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer can not go to the open market and buy syrup to replace any which the grower may fail to deliver.

"Violators pay the costs of fighting them.—(c) If the association brings any action whatsoever, by reason of a breach or threatened breach hereof, the grower agrees to pay to the association all costs of court, costs for bonds and otherwise, expenses of travel, and all expenses arising out of or caused by the litigation, and any reasonable attorney's fees expended or incurred by it in such proceedings; and all such costs and expenses shall be included in the judgment and shall be entitled to the benefit of any lien securing any payment thereunder.

"The contract is complete on its face.—19. The association is expressly authorized to exercise any or all of the grading, inspecting, marketing, or other powers or rights granted hereunder through any central agency to be organized for co-ordinating the activities of this and similar co-operative marketing associations in other States. The association shall, if possible, enter into a contract for such purpose; and may agree to pool the products delivered hereunder with products of similar variety, grade, and quality,

delivered to generally similar associations under marketing agreements substantially the same in effect as this agreement; and to unite with any such associations in the joint purchase, construction, lease, or use of terminal or other facilities, to assume obligations therefor. Any cost of maintaining such central agency shall be prorated among the said associations on the basis of the gross sales proceeds from the product delivered by them respectively, and shall be considered part of the costs and deductions provided for in paragraph 6.

"Read, considered, and signed by the grower, as of the date determined by the association contract in the State of Georgia."

"Minor changes may be made.—18. These provisions are subject to minor modifications or amendments by the organization committee, on the suggestion of State officials or otherwise, so as to carry out the general purpose hereof. All contracts are the same.—There are no favorites.—19. It is expressly agreed that this instrument is one of a series substantially identical in terms. All such instruments shall be deemed one contract for the purpose of binding the subscribers, to the same extent as if all of the subscribers had signed only one such contract. 20. The parties agree that there are no oral or other conditions, promises, covenants, representations, or inducements in addition to or at variance with any of the terms hereof; and that this agreement represents the voluntary and clear understanding of both parties fully and completely.

"Do not sign without reading. Read, considered, and signed at Whigham, Ga., this 2 day of Feb., 1922.

"Grower—Guy Harrell, P. O. Address, Whigham, County Grady. Production in 1920 was 170.

"Signature taken and membership fee received in form of cash $.......... Check $.......... by A. L. Mobley, Association Representative."

In his answer the defendant contended, that the plaintiff had breached the contract by failing to pay over the purchase-price of 234 barrels of syrup received by the association in the year 1922, or to make any statement of the defendant's account after having paid him $9.50 per barrel by way of two advancements, whereas the syrup was worth $12.50 per barrel or more; that the contract sued on was one in restraint of trade, and therefore void; that it

was not authorized by the act under which the plaintiff purported to do business; and that the act under which the plaintiff was incorporated was unconstitutional, because: (1) the body of the act includes subject-matter not referred to in the caption; (2) it attempts to provide for the issuance of a mandatory injunction, the grant of which would be oppressive to the defendant.  Upon a hearing the contract was introduced in evidence without objection; and testimony was submitted in support of the allegations of the petition, showing that the defendant was a member of the association and in 1922 was vice-president thereof; that he signed the contract; that thereafter he sold 30 barrels of syrup to a person other than the association; and that he had not delivered, but on the contrary refused to deliver, to the association any portion of the syrup made from cane grown by him in the year 1923.  In addition to the allegations in the sworn answer, which was used as evidence, the defendant testified, that he had at all times been ready to abide by the contract; that he had furnished the association with 234 barrels of syrup in 1922, each barrel containing 35 gallons or more, which had been sold by the association to a Columbus cannery for 36 cents per gallon, amounting to more than $3000; that he had received no money from the association, except an advance at one time of $8 per barrel and at another time $1.50 per barrel, although the association had received payment in full from the Columbus cannery; that the only accounting ever accorded him by the association was a statement by the secretary and treasurer that from the funds in hand he would probably receive an additional 50 cents per barrel; that the syrup made in 1923 was perishable in its nature, and likely to ferment and become unmarketable and less valuable if not sold by March 1, 1924; and that the defendant was solvent and amply able to respond in any damages which the association might recover against him for a breach of the contract and failure to deliver the syrup as agreed.

The trial judge granted the injunction as prayed, permitting, however, the defendant to retain possession of any syrup made in the year 1923, upon giving bond in the sum of $500, conditioned upon his abiding the final judgment in the case.  Exception was taken to this judgment.

*S. P. Cain,* for plaintiff in error.

*Ira Carlisle* and *Hollins Randolph,* contra.

*Aaron Sapiro, Bryan & Middlebrooks,* and *Pottle & Hofmayer,* for persons at interest, not parties of record.

RUSSELL, C. J., concurring specially. I can not agree that the very important questions raised by the present record should be dismissed in the casual and summary manner, as it seems to me, in which they are disposed of in the syllabus. I concur in the conclusions reached in the first and second headnotes. I can not concur in the ruling stated in the third headnote, because it is perfectly plain to me that the assignment of error referred to in the third headnote refers to article 4, section 2, paragraph 4, of the constitution, and it is my opinion that the use of the words "section 1" instead of section 2 is a mere clerical or typographical error which should not be taken advantage of to avoid a decision upon the question whether the provisions of the co-operative marketing act create a monopoly or authorize contracts which are in restraint of trade. Furthermore, the record presents for adjudication several questions not mentioned in the decision of the majority of the court, upon which I feel it my duty to rule as far as I am able by the expression of my individual opinion. My opinion upon the questions involved in this case, stated seriatim, is as follows:

1. The necessities of a great public interest may authorize a reasonable classification of citizens, as between diverse interests or occupations. It is within the power of the legislature to consider and act upon existing or varying conditions as affecting the public welfare in conformity with those economical conditions; and existing economical conditions may of themselves justify or compel legislation classifying farmers as a class requiring beneficial legislation. The classification of farmers as a producing class, whose labors are individualistic and not by the group, as in many other forms of labor, is a reasonable, just, and proper exercise of the power of classification.

2. The title of the co-operative marketing act is sufficiently broad to include the provisions of sections 3, 4, 5, and 23 of said act; and for that reason said sections are not void as in violation of art. 3, sec. 7, par. 8, of the constitution of Georgia.

3. Section 15 of the co-operative marketing act, supra, which authorizes the by-laws and marketing contract to fix liquidated damages and to require the members to pay all costs; premiums

for bonds, expenses and fees, as well as providing for injunction and a decree for specific performance, is not unconstitutional and void as being in conflict with article 3, section 7, paragraph 8, of the constitution of Georgia, upon the ground that there is nothing in the title of said act covering said provisions. Nor is section 15 of said act violative of article 1, section 4, par. 1, of the constitution, which forbids the passage of a special law in any case for which provision has been made by an existing general law.

4. The co-operative marketing act of 1921 is not unconstitutional because it permits one who has contracted to deliver his products to be restrained from breaching and violating the contract to the irreparable injury of the opposite party. The General Assembly in providing the remedy of injunction as provided in the co-operative marketing act only exercised its constitutional powers. The power of providing forms for administering justice by specific remedies is inherent in the General Assembly, and legislative control over forms of remedies is unlimited as long as there is no deprivation of due process of law. The legislature had the power to provide injunction if in its discretion that form of remedy or mode of redress is better adapted to accomplish the object proposed than another form of judicial proceeding. By reason of the declared object and purposes of the association which the General Assembly authorized to be created, associations organized under the co-operative marketing act would be entitled in any event to specific performance in the enforcement of the contract.

5. It plainly appears from the terms of the co-operative marketing act of 1921, as well as from the mode of business to be carried on by the association authorized to be created by said act, and from the contract in evidence, that the Cane Growers Co-Operative Association is not intended to create a monopoly, within the meaning of that word as used in art. 4, sec. 2, par. 4, of the constitution. So far as appears from the present record, it will be impossible for it to create a monopoly (within the ordinary significance of that term) in the agricultural product with which it deals. Nor is the contract between the Cane Growers Co-Operative Association and its members invalid as in restraint of trade.

6. The contract upon which the plaintiff in the lower court based its action is in conformity with the terms of section 15 of the co-operative marketing act, which authorizes the making of a

contract whereby the Cane Growers Co-Operative Association may make a sale of the agricultural products of its members, and provides that the purchase-price of the same shall be paid over to its members after deducting necessary selling, overhead and other costs. The mere fact that the association has not completed settlement with the member for the produce sold to it in the preceding year (where all produce has not been sold and the proceeds of sale collected by the co-operative association) is not such a breach of the contract by the association as will relieve the member from his duty to deliver to the association · the produce stipulated to be delivered by him for a subsequent year.

7. The plaintiff in error, being a member and officer of the association upon which the act of 1921 confers special benefits and privileges, is not in position to attack the act upon the ground of unconstitutionality.

In 1921 the General Assembly of this State passed a law, the title of which is as follows: "An act to promote, foster, and encourage the intelligent and orderly marketing of agricultural products through co-operation, and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products; and for other purposes." This act provides that this law shall be referred to as the "co-operative marketing act." This law is a mere enabling act. The General Assembly, by the express terms of this enabling act under the provisions of which the Cane Growers Association and other similar associations are authorized to be formed, entered a new field of legislation; and since there has been no reason prior to this time for this court to construe the provisions of the law, I deem it proper to advert briefly to some of its main features. The business operations of the associations authorized by the co-operative marketing act are expressly confined to the sale of the products grown by members of the association. Their association can not buy from or sell for producers who are not members of the association, nor can it perform similar services for dealers or manufacturers. The association has no capital stock. It is forbidden to make any profits. It is obvious from these provisions (not to refer to many similar features of the act) that the law was intended to effect only the purposes set forth in the

title of the act; that is, to promote and encourage intelligent and orderly marketing of agricultural products through co-operation and stabilize the marketing problems of agricultural products. Furthermore, since it is our duty prima facie to presume that the General Assembly would not pass any legislation in violation of the constitution, and since for that reason doubts as to the constitutionality of the act must be resolved in favor of its constitutionality, it is well to consider the condition of affairs which led to the evolution, not only of the Georgia co-operative marketing act, but of a mass of practically similar legislation on the part of other commonwealths.

The legislatures of thirty or more of the principal agricultural States of this Union have enacted enabling acts, practically, if not precisely, identical with the act in question. The validity of this new character of legislation has been upheld in all its phases by the Supreme Courts of North Carolina, Tennessee, Kentucky, Texas, and several other States, and the principles underlying it have been affirmed by the Supreme Court of the United States in rulings made where the provisions of the Sherman act and features of the Clayton act were involved. There is not a single substantial issue of fact in the case now before us. Each assignment of error will be hereinafter specifically dealt with. However, as it is perfectly plain that, if any of the exceptions presented by the plaintiff to the judgment in this case are meritorious, the design of this legislation will be marred, and the Cane Growers' Association, and other similar associations designed for the sole purpose of relieving a condition of extreme economic depression in all agricultural pursuits, will be blighted, shrivel and die, it is proper that the basis upon which the General Assembly has attempted to exercise its right to legislate be considered. It may be said, what has this to do with constitutional questions? The reply is that the General Assembly is the author of every law, and it is the only authority to say what shall be enacted. What has current public opinion to do with constitutional inhibitions and guaranties? Just this: It affords a very proper method of approach to the determination of the meaning of constitutional provisions. The assignment of error that the judgment before us for review was erroneous because the judge issued a mandatory injunction, and because he issued an injunction without any allegation or proof that the de-

fendant was insolvent, prima facie in an ordinary case, might entitle the plaintiff in error to a reversal. But the provisions of law as to insolvency, and to the effect that generally equity does not command but only restrains, are not exhaustive of all situations in which injunctive relief may be applied. Our reports are full of cases where injunction has been applied as a remedy where nothing but injunction would prevent an irreparable wrong. If, as is perfectly plain, the General Assembly in passing an enabling act authorizing the formation of such an association as the defendant in error could not give it actual and effective existence without the remedy of injunction, can it be said that the General Assembly does not possess the constitutional right to provide the remedy of injunction in an altogether new condition, and for the relief of a condition which has never before been the subject of legislative action? To say this, it seems to the writer, would be to assert superiority of authority on the part of the judiciary, and to destroy that equal independence of the legislative branch of government, which is declared by the organic law of the State. The necessities of a great public interest may evolve legislation and authorize a reasonable classification as between diverse interests and organizations.

It is within the power of the General Assembly to consider and act upon varying conditions as affecting public welfare, in conformity with changing economic conditions; and existing economic conditions may, of themselves, justify or compel legislation classifying farmers as a class requiring beneficial legislation. The New York Court of Appeals in People v. La Fetra, 230 N. Y. 429 (130 N. E. 601, 16 A. L. R. 152), clearly states the principle: "Novelty is no argument against constitutionality. Changing economic conditions, temporary or permanent, may make necessary or beneficial the right of public regulation. The question comes back to what the State may do for the benefit of the community at large. Here the legislation rests on a secure foundation. The struggle to meet changing conditions through new legislation constantly goes on." As said by President Harding at the agricultural conference, Jan. 23, 1922: "From the very nature of things farmers can not produce in groups. Their occupation is essentially personal and individualistic. A great manufacturing industry can consolidate under the ownership of a single corporation, with a multitude of stockholders, a great number of originally separate

establishments, and thus effect economies and concentrations and acquire for itself a power in the markets where it must buy, and in the markets where it must sell, such as have not been available to agriculture. The farmer is the most individualistic and independent citizen among us. He comes nearer to being self-sufficient, but precisely because of this he has not means of co-operation, co-ordination, and consolidation which serve so usefully in other industries. A score or more manufacturers consolidate their interests under a corporate organization and attain a great increase of their power in the markets, whether they are buying or selling. The farmer, from the very mode of his life, has been estopped from these combinations; therefore, because he buys and sells as an individual, it is his fate to buy in the dearest, and sell in the cheapest market. . . Take co-operative marketing. American farmers are asking for, and it should be possible to afford them, ample provision of law under which they may carry on in co-operative fashion those business operations which lend themselves to that method, and which, thus handled, would bring advantages to both the farmer and his consuming public."

The State has the power to reasonably classify its citizens or to recognize and approve an actually existing classification. The classification of farmers as a producing class whose labors are individualistic and not by the group is a reasonable, just, and proper exercise of the power of classification. Classification of persons whose labors or production is by the group has long been recognized, both in the State and Federal courts, as will appear from the authorities hereinafter cited; and it would seem that it would be an equally reasonable exercise on the part of the General Assembly to make another and different classification, including only producers of agricultural products, with the necessary subdivisions embracing all the kinds of agricultural products from cotton to cucumbers. Though the trite statement, "everything rests upon agriculture," may have been often used for demagogic purposes, I deem it not unjudicial to reaffirm the proposition and to say that even the constitution itself relies for its support upon the pursuit of agriculture under healthful conditions; for if there were no production of food to maintain life, there would be no people for the constitution to serve and no people to support the constitution.

The first insistence of the plaintiff in error is, that the defendant

was solvent and able to respond in damages; that the syrup which the court enjoined him from selling was perishable; and that in granting the interlocutory injunction the court made a mandatory injunction which is oppressive, and the grant of a temporary injunction was an abuse of discretion. We shall not deal with this contention at this point, because there is also an insistence that the act is unconstitutional, because the title is too narrow to cover the contents, and because it is a special enactment for which provision has already been made by existing general law. Considering first the second proposition presented by the plaintiff in error, is the act unconstitutional because injunction is provided as a remedy to enforce the performance by the plaintiff in error of an obligation which he had voluntarily assumed? It would seem that this question suggests a preliminary inquiry as to whether the plaintiff in error is in a position to assert that he shall not be prevented from performing a contract which he himself has undertaken and obligated himself to perform. The authorities seem to hold that he is estopped. However this may be, it is plain that the order entered by the trial judge was not mandatory. He did not command Harrell to deliver any syrup to the Cane Growers Association. Had the court ordered Harrell to deliver his syrup to the association, the order would have been mandatory. On the contrary the court merely restrained Harrell from selling or delivering his syrup to any one else, until the validity of his agreement with the association should be determined. We might stop here, but for the fact that the co-operative marketing act specifically provides that a member of the association (as Harrell was) may be required specifically to perform his agreement and undertaking to deliver all of the syrup produced by him to the association. This brings us to the question of specific performance, the question as to whether the General Assembly had the constitutional right to provide that there should be specific performance of the contracts which the association it was authorizing to do business should be entitled to in the event one of its members breached the contract to furnish to the association all of a particular agricultural product derived from crops grown upon his land or upon land under his control. The power of the General Assembly to prescribe remedies can not be questioned. Essential rights and rules of procedure are within the exclusive

prerogative of the courts, but the nature of the remedy to be provided has always been held a legislative function. The legislature had the right to determine that under the circumstances and nature of the business which the association was formed to promote, a remedy in damages would be ineffectual·to procure the result which was absolutely essential to make the service of the association effective and to give it real existence.

When the purposes of the act, as stated in the caption, are considered, it will readily appear that a recovery of damages for a breach of the contract entered into between the plaintiff and defendant in this case would so completely fail to furnish relief, in case there was a breach of the contract to deliver produce, that the whole object for which the association was formed would be defeated. Compensation in damages could not be made, because the injury is of such nature that the computation is impossible. The plan upon which the association is conducted makes its success depend, not upon the making of money for the association, but upon having such influence on the market price of the article which the defendant and other cane-growers produced as would be beneficial to the producers within the association and enable each and every one of them to obtain a fair market price. As said by Mr. Chief Justice Clark in Tobacco Growers' Co-Operative Association *v.* Jones, 185 N. C. 265 (117 S. E. 174, 176, 33 A. L. R. 231), "Damages, of course, are of no real value. The association must have crops to market, or it will go out of business; therefore relief in equity is provided, and it is an essential point in this case." Without the provision of section 15 of the co-operative marketing act, affording an injunction preventing the member of the association who has promised to deliver his crop to the association from delivering it to another until a decree of specific performance can be rendered, the entire act would be nothing more than "a sounding brass and a tinkling cymbal." The effort of the General Assembly to provide a measure which might tend to enable the great farming class of our people to obtain a fair market price would be completely frustrated by holding that specific performance could not be decreed, and it would be futile to provide specific performance; for after the produce has been delivered to another, under a well settled rule the right of specific performance must be denied, because specific performance is then impossible.

As specific performance is generally available in equity in cases where damages can not supply the equivalent to delivery of a specific thing, why may not injunction be applied as an antecedent ancillary proceeding to restrain any disposition of the property which will destroy the right to have the specific property delivered, where one is entitled to specific performance under such circumstances? It is not necessary to say more upon this point. I have referred to it at this stage merely because I think that, even without the passage of the co-operative marketing act, the judge might have granted an injunction where specific performance ought to have been decreed as to the delivery of a specific article, although, as will appear hereafter, I am of the opinion that the General Assembly had the right to embody in the provisions of the act a remedy both by specific performance and injunction.

Whether the defendant was released because the contract was breached by the plaintiff (the Cane Growers Association) by failure of the plaintiff to carry out its contract must be determined by the stipulations of the contract with reference to the matter. The pith of the defendant's contention is that the association has not paid him for the syrup furnished by the defendant the amount of money which the association received from the sale thereof. For this reason the defendant contends that he is released from any obligation to furnish the syrup produced by him for the succeeding year. The nature of the contract, which the defendant voluntarily entered into, does not impose any obligation on the association to pay to any one producer the amount received from the sale of that particular article, or pay him the entire proceeds of a sale if the entire crop delivered by him be sold as a whole. The member agrees to enter a pool, and, in consideration of the benefits anticipated as a result of the pooling arrangement, he agrees to accept the best price the association is able to get for the membership as a whole upon produce of the same quality as that furnished by him, after a complete accounting has been made and payment of all debts and expenses necessary in effecting the sale of the syrup as a whole. The record discloses without contradiction that at the time the defendant refused to deliver the crop produced by him in 1922 there had been no final settlement by the association with its members for the syrup sold by them in 1921, and that in fact the sales for the year 1921 had not been completed. It is

very clear that the association was not able to pay Harrell as much for his syrup as it had received, by reason of the expenses of the business. But the association had made him advances, as it had to other members. Not all the syrup had been sold, and the association was therefore unable to make a final division and settlement for 1921. The amount to be divided could not be determined, by reason of the failure to sell all the syrup. The circumstances did not authorize the conclusion that the plaintiff intended to breach the contract, and its delay in making settlement was in contemplation of the contracting parties at the time Harrell made his contract. The real question, considering the intention of the parties in making the contract, is not whether Harrell received as much money for his syrup as the association was paid for it, but whether he will not get a better price than would have ever been received for the syrup if all of the syrup produced by the members of the association had not been pooled. From this it will be apparent that if the contract is valid and enforceable under the provisions of the co-operative marketing act, there is no merit in the insistence of the plaintiff in error.

So we come to consider the objections based on the alleged unconstitutionality of the co-operative marketing act. Is the act unconstitutional as in violation of article 3, section 7, paragraph 8, of the constitution? It is contended that the act in question contains in the body thereof matter different from what is expressed in the title. A substantial and not a literal compliance with this requirement of the constitution is all that is necessary. *Macon &c. Ry. Co.* v. *Gibson*, 85 *Ga.* 1 (11 S. E. 442, 21 Am. St. R. 135). It was never contemplated that the title of the act should give a complete synopsis of the act. The title of the co-operative marketing act is sufficiently definite to indicate its general purpose and scope. "The body of the act contains nothing that is different from what is expressed in the title of the act" (*Hill* v. *Decatur*, 22 *Ga.* 203), and all of the provisions of the act are in accord with the declared purpose stated in the caption. In *Jones* v. *Columbus*, 25 *Ga.* 610, Judge McDonald, speaking for the court, held that the title, "to raise a revenue for the City of Columbus, is broad enough to admit any provision for that purpose," holding at the same time that even "the addition" to the language "to raise a revenue," etc., "of the words 'amendatory of the act of 1841,' can not re-

strict the power of the legislature to act as expressed in its title." In that case the court held, adversely to the contention that the act contained matter not indicated by the caption, that "the object was expressed in the broadest terms, so as to admit of any taxation by the legislature, or of any provision to authorize taxation by the Mayor and Council of Columbus within its constitutional power to grant." It may be remarked also, on the question (to which we have already referred) of the power of the State to apparently distinguish upon grounds of public policy, without unlawful discrimination, between individuals environed and affected by different circumstances and conditions, that this court, in the same case, supra, ruled upon a similar point. The plaintiff in error, who was not a resident of Columbus, contended that "more tax is imposed" on his property in slaves "than on that of residents within the city."

The reason assigned why the co-operative marketing act offends the above-recited provision of the constitution is that there is nothing in the caption of the act to indicate a purpose on the part of the General Assembly to allow the corporation for the creation of which provision is made to exercise the powers conferred by section 15 of the act in regard to attorney's fees and other expenses of litigation in addition to the usual costs provided by law. It is contended that there is no allusion in the title to these provisions. Even in the criminal case of *Brown* v. *State, 73 Ga.* 38 (and in such cases the law must always be strictly construed), this court held adversely to such a contention. The title of the act in question in that case was, "to provide for the collection of the special taxes imposed by law on dealers in spirituous or malt liquors or intoxicating bitters, and for other purposes." In the body of the act the non-payment of the tax was made a crime, and it was provided that upon a failure to pay such tax the dealer might be indicted and punished as for a misdemeanor. Yet the court held that the act was not objectionable either as containing matter different from its title or as containing more than one subject-matter. It may be stated as a general rule, based upon the general principle that all legislation is presumptively constitutional, and that he who attacks the constitutionality of a legislative enactment carries the burden of establishing its constitutional invalidity, that an act will not be declared unconstitutional upon

the ground that the substance of the act is too broad to fit the caption, if the language of the caption is broad enough to include permission to do any act which it is necessary to do in order to accomplish the purposes stated in the caption.    Thus it has been held in numerous decisions of this court that the mere words "and for other purposes" may be sufficient to call the attention of the General Assembly to the probable contents and consequences of the act proposed to be passed, so as to put the members of the legislature on guard and direct their attention to any matter germane to the general purpose of the act.    *Martin* v. *Broach,* 6 *Ga.* 21 (50 Am. D. 306) ; *Burns* v. *State,* 104 *Ga.* 544 (30 S. E. 815) ; *Hart* v. *State,* 113 *Ga.* 939 (39 S. E. 321) ; *Banks* v. *State,* 124 *Ga.* 15 (52 S. E. 74, 2 L. R. A. (N. S.) 1007).    Upon the subject of the sufficiency of the title to include the contents of an act generally, see *Martin* v. *Broach,* supra; *Pope* v. *Mayor,* 72 *Ga.* 246; *Howell* v. *State,* 71 *Ga.* 224 (51 Am. R. 259) ; *Goldsmith* v. *Rome R. Co.,* 62 *Ga.* 473; *Churchill* v. *Walker,* 68 *Ga.* 681.    As said in the *Pope* case, supra, the object of the provision is to insure separate consideration of · each subject presented for legislative action and a declaration of such subject.    In *Ex parte Connor,* 51 *Ga.* 573, it was said that one of the reasons why a clear statement of enough of the general purpose of the act is required is to prevent "logrolling."    In *Robinson* v. *Bank,* 18 *Ga.* 65, 89, it was held that where the title of an act indicates the legislative purpose to extend the charter of a corporation, provisions in the act setting out the terms and conditions under which the extension is granted are not at variance with the title.    A case which seems to be in point upon the precise question now before us is that of *Davis* v. *Bank,* 31 *Ga.* 69, in which it was held, that, in an act granting a charter to a bank, any grant of franchise or franchises may be conferred without embodying matter different from what is expressed in the title of the act.    Having already held that the general purposes of the act were not in conflict with any provisions of law, under the above rulings it was not necessary to state these lawful purposes in the caption of the act.    Likewise in the *Goldsmith* case, supra, it was held that the omission in the title of the act granting a charter did not render that provision of the act unconstitutional.

The exception to the order of the court granting the temporary

injunction, as contained *in the bill of exceptions,* so far as it relates to the ground of unconstitutionality is as follows: "Because the act under which the plaintiff was operating *is unconstitutional on the grounds referred to and set forth in defendant's answer;* and because the contract sued on is not authorized by said act, for the reasons set forth in the answer." In the answer it is alleged, in paragraph 8, "that so much of section 15 of the act of 1921, page 139, entitled Distribution of Agricultural Products, Co-operative Marketing Act, as seeks to authorize the by-laws and marketing contract to fix liquidated damages and to require the members to pay all costs, premium for bonds, expenses and fees, as well as providing for injunction and a decree of specific performance, is unconstitutional and void as being in conflict with art. 3, sec. 7, page [par. ?] 8, of the constitution of Georgia, in that there is nothing in the title of said act covering said provisions, and because said provisions are unconstitutional and in violation of art. 1, sec. 4, par. 1, of the constitution, in that the general laws of the State have provided for the issuing of temporary injunction, for the payment of court costs, and other provisions stated in said section." In paragraph 10 of the answer, "Defendant shows that the act under which the plaintiff was incorporated and the contract made in this case pursuant thereof are null and void, in that the same is in violation of art. 4, sec. 1, par. 4, of the constitution, in that it was the intention of the plaintiff and the members forming the same to combine all of the cane products grown in southwest Georgia, so as to be able to fix the price at which the same would be sold, and to be able to effect a corner of the syrup manufactured in southwest Georgia, so as to enable the association to dictate the price to be paid for said syrup by the canners who depended upon said crop for their material to operate their canneries." In paragraph 11 of the answer, "Defendant shows that sections 3, 4, and 5 of said act under which the plaintiff was incorporated is unconstitutional, in that the title of said act does not cover said provisions and does not authorize the creation of an incorporation as set forth therein, and is therefore in violation of art. 3, sec. 7, par. 8, of the constitution of Georgia." It thus appears that aside from the general attack upon the constitutionality of the co-operative marketing act of 1921 as a whole, upon the ground that art. 3, sec. 7, par. 8, is violated, and which we have

overruled, the plaintiff in error attacks, upon the grounds just quoted, sections 3, 4, 5, 15, and 23 of the act, which are as follows:

"Sec. 3. Be it further enacted, that an association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, preserving, drying, processing, canning, packing, storing, handling, shipping, ginning, or utilization thereof; or in connection with the manufacturing, selling, or supplying to its members of machinery, equipment, or supplies; or in the financing of the above-enumerated activities; or in any one or more of the activities specified herein.

"Sec. 4. Be it further enacted, that each association incorporated under this act shall have the following powers: (a) To engage in any activity in connection with the marketing, selling, harvesting, preserving, drying, processing, canning, packing, storing, handling, ginning, or utilization of any agricultural products produced or delivered to it by its members; or the manufacturing or marketing of the by-products thereof; or in connection with the purchase, hiring, or use by its members of supplies, machinery, or equipment; or in the financing of any such activities; or in any one or more of the activities specified in this section. No association, however, shall handle the agricultural products of any non-member. (b) To borrow money and to make advances to members. (c) To act as the agent or representative of any member or members in any of the above mentioned activities. (d) To purchase or otherwise acquire, and to hold, own, and exercise all rights of ownership in, and to sell, transfer, or pledge shares of the capital stock or bonds of any corporation or association engaged in any related activity or in the handling or marketing of any of the products handled by the association. (e) To establish reserves and to invest the funds thereof in bonds or such other property as may be provided in the by-laws. (f) To buy, hold, and exercise all privileges of ownership over such real or personal property as may be necessary or convenient for the conducting and operation of any of the business of the association or incidental thereto. (g) To establish, secure, own, and develop patents, trade-marks, and copyrights. (h) To do each and everything necessary, suitable, or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the

objects herein enumerated, or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and in addition to exercise and possess all powers, rights, and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged; and in addition, any other rights, powers, and privileges granted by the laws of this State to ordinary corporations, except such as are inconsistent with express provisions of this act; and to do any such thing anywhere.

"Sec. 15. Be it further enacted, that the association and its members may make and execute marketing contracts, requiring the members to sell, for any period of time, not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association. The contract may provide that the association may sell or resell the products of its members, with or without taking title thereto; and pay over to its members the resale price, after deducting all necessary selling, overhead, and other costs and expenses, including interest on preferred stock, not exceeding 8 per cent. per annum, and reserves for retiring the stock, if any; and other proper reserves; and interest not exceeding eight per cent. per annum upon common stock; or other items deemed proper. The by-laws and the marketing contract may fix, as liquidated damages, specified sums to be paid by the member or stockholder to the association, upon the breach by him of any provision of the marketing contract regarding the sale or delivery or withholding of products; and may further provide that the member will pay all costs, premiums for bonds, expenses and fees in case any action is brought upon the contract by the association; and any such provisions shall be valid and enforceable in the courts of this State. In the event of any such breach or threatened breach of such marketing contract by a member, the association shall be entitled to an injunction to prevent the further breach of the contract, and to a decree of specific performance thereof. Pending the adjudication of such an action and upon filing a verified complaint showing the breach or threatened breach, and upon filing a sufficient bond, the association shall be entitled to a temporary restraining order and preliminary injunction against the member.

"Sec. 23. Be it further enacted, that no association organized

hereunder shall be deemed to be a combination in restraint of trade or an illegal monopoly, or an attempt to lessen competition or fix prices arbitrarily; nor shall the marketing contracts or agreements between the associations and its members or any agreements authorized in this act be considered illegal or in restraint of trade."

The first exception raises the question, whether the provision as to injunction in the co-operative marketing act of 1921 is constitutional; and second, whether the caption of the act was broad enough to include the provisions of sections 15, and 3, 4, and 5 of said act, so as to authorize the creation of the corporations and the grant of the powers set forth in these sections. It is the purpose of the law to provide a remedy for every wrong; and in determining whether the legislature has the power, which is generally conceded, to provide any remedy which may be necessary to reach and cure the wrong, it may not be amiss to consider that from the very beginning of our judicial history it has been held that the legislature may charter any form of corporation which it may select. In the early case of Dartmouth College v. Woodward, 4 Wheaton, 518 (4 L. ed. 629), it was held that the purpose for which a corporation was created was a matter entirely for the State and such as would carry out some design which the State desired to promote, the benefits to the public constituting the consideration for corporate authority. In the Slaughter-House Cases, 16 Wallace, 36 (21 L. ed. 394), a charter granting the exclusive right to slaughter meat in the city of New Orleans was sustained on the ground that the legislature had plenary powers to charter any form of corporation. To the same effect was the decision of the Supreme Court of the United States in New Orleans Gas-Light Company v. Louisiana Light Company, 115 U. S. 650 (6 Sup. Ct. 252, 29 L. ed. 516). Also, Penobscot Boom Corporation v. Lamson, 16 Maine, 229 (33 Am. D. 656); Killingsworth v. Portland Trust Co., 18 Oregon, 351 (23 Pac. 66, 7 L. R. A. 638, 17 Am. St. R. 737). The attack made upon the provision for injunction is that it is unconstitutional to give the plaintiff injunctive relief. Legislative control over forms of remedies is unlimited so long as there is no deprivation of due process of law. In Iowa Central Railway Co. v. Iowa, 160 U. S. 393 (16 Sup. Ct. 345, 40 L. ed. 467), where the defendant attacked a statute providing for remedy by mandamus without a jury trial, the court held:

"The fourteenth amendment in no way undertakes to control the power of a State to determine by what process legal rights may be asserted or legal obligations be enforced, provided the method of procedure adopted for these purposes gives reasonable notice and affords fair opportunity to be heard before the issues are decided. This being the case, it was obviously not a right, privilege, or immunity of a citizen of the United States to have a controversy in the State court prosecuted or determined by one form of action, instead of by another. It is also equally evident, provided the form sanctioned by the State law gives notice and affords an opportunity to be heard, that the mere question of whether it was by a motion or ordinary action in no way rendered the proceeding not due process of law within the constitutional meaning of those words." To the same effect are the rulings in State *v.* Diamond Mills Co., 63 N. J. Eq. 111 (51 Atl. 1019, 1021) ; Commissioners *v.* Farmers Bank, 21 Pick. 542, 552 (32 Am. D. 290) ; Johnson *v.* Yates, 183 N. C. 24 (110 S. E. 603).

But it is insisted that the injunction provided by the act of 1921 is mandatory, and for that reason section 15 is unconstitutional, because this is a special law in conflict with the general law as to injunctions. Aside from the fact that the general law to which plaintiff in error refers is not pointed out, if, as we have already held, the power of the General Assembly to provide appropriate remedies is within its exclusive jurisdiction as a co-ordinate department of our government, then it is within the power of the General Assembly, as it frequently does by the passage of a general law, to vary or even destroy enactments previously of force. In the act of 1921 the General Assembly has made provision for a new economic condition, for a new class of incorporations, and for a new class of contracts, and is about to provide a remedy in case of violation of such contracts. It seems perfectly plain, under the generally recognized power of the General Assembly to pass upon the form of remedial legislation to be employed in any case, that it may direct the grant of injunctive powers by the court in a new class of cases to which it may determine the remedy is appropriate. As said in the case of State *v.* Diamond Mills Co., supra, "The legislature not infrequently extends the jurisdiction of courts, both of law and of equity, to new cases, and it assigns them to the one court or the other in conformity with the

remedy each is accustomed to administer. . . It is true that heretofore the rule in equity has been not to exercise its jurisdiction to restrain nuisances unless a serious public injury has been shown to exist—an injury not remediable in the ordinary tribunals. The reason is that the remedy at law has been found adequate. Here, however, we are dealing not with the jurisdiction ordinarily exercised by this court, but with a· jurisdiction conferred by statute. To deny the constitutional validity of the act is to assert that the legislature can not afford what is undoubtedly an appropriate remedy for a new and threatening wrong; that it may indeed punish, but can not prevent." The fact that it has heretofore been held by this court, in dealing with laws passed prior to the act of 1921, that mandatory injunctions should not be granted, affords no reason for denying the power of the General Assembly, in passing an entirely new law upon a subject not heretofore dealt with in all our legislation, to prescribe the remedy of injunction if in the opinion of the General Assembly the most appropriate redress was afforded thereby. As said by Mr. Chief Justice Shaw in Commissioners *v.* Farmers Bank, supra, "if it is competent for the legislature to accomplish these objects by any mode of judicial proceeding, it may as well be done in the form of a bill in equity as in any other. It seems to be a well settled rule that where the legislature have the power to provide redress for either a public or private wrong, the remedy or mode of redress is wholly a subject of legislative discretion. If an injunction is better adapted to accomplish the object proposed than any other form of judicial process, there seems to be no reason why the legislature should not have power to direct it." We conclude, therefore, that section 15 of the act is not unconstitutional, but on the contrary is effective for the reasons stated.

Is the association created by the act of 1921, known as the co-operative marketing act, a monopoly, or does the act "encourage monopoly?" And is the contract sub judice, by reason of the fact that it tends to encourage monopoly or for any other reason, in restraint of trade? Art. 4, sec. 2, par. 4, does not undertake to define the word "monopoly," from which it results that the courts have authority and the right to submit a definition. Citation· of authority is unnecessary to support this proposition; for our reports contain many decisions where the duty devolved upon the courts

to construe the meaning of the language employed in various constitutional provisions. A monopoly may be defined to include any agency which will give to the grantee of such monopoly control of any subject of commerce in its manufacture, sale, or production. This definition is not exhaustive, but it is perhaps sufficient for the purposes of the present adjudication. Do the provisions of the co-operative marketing act give to the association thereby permitted to be created control of the manufacture, sale, or production of syrup, so as to injuriously affect the rights of the consumers or of the public generally? Likewise the same question applies to the Cotton Growers Association and the Peanut Growers Association, who have filed briefs in behalf of these two corporations organized and operating under the provisions of the co-operative marketing act. In ruling upon this question as to the Tobacco Growers Co-Operative Association, a corporation created under an act so similar to the one now under consideration as to be practically identical, Mr. Chief Justice Clark, speaking for the Supreme Court of North Carolina, says, "These conditions make it physically, economically, and financially impossible for the plaintiff to become a monopoly." Tobacco Growers Co-Op. Assn. *v.* Jones, 185 N. C. 265 (supra). The association to which he refers is one which embraced the tobacco growers of South Carolina, North Carolina, and Virginia, the latter two States being perhaps the largest tobacco-producing States in the Union, whereas the association with which we are dealing covers only a few counties in extreme southwest Georgia. The substance of the section of the constitution of North Carolina in intent and purpose is practically the same as our own. The language used is that "Monopolies are contrary to the genius of a free State, and ought not to be allowed." We take this language to be as strong as that employed in our constitution, which says that no act shall pass which will "encourage monopoly." All of the facts stated by Mr. Chief Justice Clark, as reasons why it is "physically, economically, and financially impossible for the plaintiff to become a monopoly," apply in the present case, except that the subject dealt with is tobacco instead of syrup, and for this reason and because the constitution of Georgia also reserves the right to repeal all charters granted since its adoption in 1877, I shall adopt the language of the learned and late lamented Chief Justice of our sister State.

"An examination of this statute shows, we think, that this association is authorized for the purpose, not of creating a monopoly, but to protect the tobacco producers against oppression by a combination of those who buy, and not to authorize, and does not empower, those who produce the raw material to create a monopoly in themselves. Indeed, it seems to us plain that the plaintiff, under the provisions of its charter, is not and never can become a monopoly, for many reasons: (1) As a corporation of North Carolina, the moment it should become dangerous to the public, if that were possible under the terms of its charter, the General Assembly can at any time repeal its charter (Const., art. VIII, sec. 1), and the courts will intervene to prevent it becoming a monopoly. (2) The plaintiff has neither capital stock or surplus, nor credit, except as given it by the statute, and this latter may be withdrawn at any time. It is wholly dependent upon its ability to borrow in large sums, which is necessarily under the control of the Federal Reserve Banking System, . . which is a function of the Government, only on such terms as that board deems consistent with the public welfare, and that board will not permit hoarding or monopolizing by the plaintiff. The power of the Federal Reserve System was shown in October, 1919, when by mere announcement of its policy it caused the deflation of the stock market. In May, 1920, when the operations of the War Finance Corporation were suspended by direction of the Secretary of the Treasury, so that it could not extend credit for the export of cotton, because cotton was scarce and a cotton famine was threatened, there resulted a drop in cotton of 30 cents a pound in six months. Therefore, were the plaintiff to attempt to monopolize the sale of tobacco, not only it would fail to control its sale by the large numbers of producers who are not members of the organization, but it would be faced with the power of the General Assembly to repeal its charter, . . and it would be denied the privilege of borrowing from the Federal Reserve Bank or any of its correspondents. It would be subject to the visitorial powers of the Secretary of Agriculture under the anti-trust laws; and finally it would be confronted with the huge increase in the acreage devoted to tobacco, and, by the holding off from the market the normal production of any one year, the result would be the selling of two crops within a single year. As was well said by Mr. Pou, one of the counsel for the plaintiff, 'these conditions make it physically, economically,

and financially impossible for the plaintiff to become a monopoly.'

"The plaintiff will continue to exist only if it provides for a normal, orderly marketing of the tobacco crops, and by putting on the markets of the world annually the production for that year. Its sole purpose is by an orderly marketing of the crop to make large saving, and to secure to the producers a fair and reasonable price therefor without increasing the price the consumer will pay for the manufactured article. The sole object of the association is to protect the producer of the raw article from depression in price by the combination of the large manufacturing corporations controlled by a few men who can at the same time not only decrease the price to the producer, but can increase it at will to the consumer and thereby accumulate in a few hands sums beyond computation. The co-operative association purposes to eliminate unnecessary expenses in selling, and to prevent artificially forced reduction in the price paid to the producers. Instead of creating a monopoly, the object is by a rational method of putting the raw product on the market from time to time as there is a legitimate demand for its manufacture, and by the extension of credit to farmers to enable this to be done, to prevent a monopoly of the tobacco industry by those who manufacture it."

Paraphrasing the reasoning of Mr. Chief Justice Clark to the case in hand, the enabling act was only passed "to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation, and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products; and for other purposes." The provisions of art. 4, sec. 2, par. 4, above quoted, refer to specific situations or conditions arising from the conduct of corporations, and the only inhibition is against "monopoly." It is clear that there is nothing in the act of 1921 violative of the inhibition against authorizing a corporation to buy shares of stock in another corporation for the purpose of defeating or lessening competition, and that the contracts which the association is permitted to make within the scope of its charter powers will not defeat or lessen competition in the business to be carried on by the contracting parties. Unlike other classes of our citizens, farmers are producers only. Unlike other classes of

producers the work of a farmer is individualistic, and the result of his labors is not group production as in the case of manufacturers, miners, or skilled labor engaged in manufacturing. It is plain from the caption of the act that the effect of the corporation is not intended to be to "defeat or lessen" competition between dealers or sellers of agricultural products; and that it will not have that effect, but that the intent and purpose of the act is to foster agriculture by providing a stable market, preventing speculative fluctuations and enabling the agricultural producer to sell his crops by degrees, instead of being forced by his necessities to throw the product of his labor in bulk upon a depressed (because overstocked) market, creating thereby a condition which will not lessen the price to the consumer but only enable the speculator or middleman to reap a profit which justly belongs to the producer. Does the co-operative marketing act or the contract submitted in this case "have the effect" or is it "intended to have the effect" to encourage monopoly? A mere statement of the facts of this case shows that it can not create a monopoly. The Cane Growers Co-Operative Association, which is the defendant in error in this case, covers only a portion of southwest Georgia, and the agreement is dependent upon its controlling or receiving only 25 per cent. of the area cultivated in cane. When we consider and compare the area embraced by this association with the larger areas upon which sugar-cane is grown in other States, and especially in State of Louisiana, it is apparent that it would be impossible for the incorporation and operation of the defendant in error to create a monopoly in syrup. Prima facie a law is constitutional, and it should not be declared unconstitutional unless it appears beyond any reasonable doubt to be unconstitutional. Under this rule, if the Cane Growers Co-Operative Association, whose headquarters are at Cairo, Georgia, may create a monopoly in the future, the judge correctly granted the injunction until the facts could be determined and submitted to the court by the verdict of a jury. Prima facie the contract was not intended to have the effect of creating a monopoly, and there is no evidence submitted in this record to show a contrary intent. The fact that it appears from the defendant's own answer that all syrup delivered by the defendant and other members of the association had been sold in the ordinary course of trade disposes of the contention that there

was intent to create a monopoly, in the absence of any evidence that the association had bought and resold any syrup other than that produced by its own members.

It is said that the act is unconstitutional and in restraint of trade, because it violates art. 4, sec. 1, par. 4, of the constitution. As there is no paragraph 4 in section 1 of article 4 (section 1 consisting of only one paragraph, which relates to taxation), I assume that the plaintiff in error intended to refer to the only place in the constitution where the word "monopoly" is mentioned, to wit, art. 4, sec. 2, par. 4, and that the use of the figure 1 instead of 2 is a mere typographical error. I have heretofore quoted the exception as contained in paragraph 10 of the defendant's answer. Art. 4, sec. 2, par. 4, of the constitution upon the subject of monoplies is as follows: "The General Assembly of this State shall have no power to authorize any corporation to buy shares of stock in any other corporation in this State or elsewhere, or to make any contract or agreement whatever with any such corporation, which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly; and all such contracts and agreements shall be illegal and void." This paragraph deals only with contracts made on the part of one corporation with another, and only refers to such of these as have the effect or are intended to defeat or lessen competition in their respective businesses. It is plain that there is nothing in the co-operative marketing act which falls within the provisions of this article of the constitution. Section 23 of the co-operative marketing act provides that no association organized under the provisions and in accordance with the terms of that act "shall be deemed to be a combination in restraint of trade or an illegal monopoly; or an attempt to lessen competition, or to fix prices arbitrarily; nor shall the marketing contracts or the contract between the association and its members or any agreement authorized in this act be considered illegal or in restraint of trade."

Is the contract in question in restraint of trade? We think not. The question as to whether certain contracts are in restraint of trade has been dealt with by this court in *Holmes* v. *Martin,* 10 *Ga.* 503, *Jenkins* v. *Temples,* 39 *Ga.* 655 (99 Am. D. 482), and *Rakestraw* v. *Lanier,* 104 *Ga.* 188, 196 (30 S. E. 735, 69 L. R. A. 154). In the *Rakestraw* case the court applied the yardstick by

5

which the contract is to be measured, saying: "But if, considered with reference to the situation, business, and objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them, and not specially injurious to the public, the restraint will be held valid. The true test, therefore, of the validity of such a contract is, whether it is supported by a sufficient consideration, and whether the restraint is reasonable." Comparatively recent decisions of courts in numerous jurisdictions have added a new test of the validity of a contract alleged to be in restraint of trade, to wit, that a contract which is to the interest of the public can not be held void because a holding that a certain contract is in restraint of trade is itself based upon the principle that it is contrary to public policy because the contract is against the interest of the public. The ruling in the *Rakestraw* case has reference to the older classifications of contracts in restraint of trade, which looked merely to the interests of the contracting parties, while here the caption of the act itself relates to a matter of public interest and general concern,—the promotion of agriculture and the orderly marketing of crops as a matter of deep public interest in which 81 per cent. of our population are engaged. However, bearing in mind that the rules which invalidate contracts upon the ground that they are in restraint of trade are based upon public policy, the rules laid down in the *Rakestraw* case, supra, applied to the subject-matter of this contract, cover every phase of this case. Under the rule in that case, the first test to be applied is based upon a consideration of the situation, business, and objects of the parties. In this contract it appears that the plaintiff in error is a cane-grower, a member of the association with which he is contracting, and the business of which is to provide a stable market for cane producers and the best price obtainable for the products of cane. "The objects of the parties" must be the same. The *Rakestraw* rule provides a second test—that the contract must be construed "in the light of all the surrounding circumstances with reference to which the contract was made." The circumstances which surrounded the incorporation of the association in this case and the entrance of the plaintiff in error into its membership and official guidance as vice-president

thereof are matters of common knowledge. At the time the association was organized a reversion from the high prices previously paid for agricultural products had ensued. It is known of all men that for the past several years agriculture, no matter what the nature of the produce, has suffered from a depression of prices. The common purpose of both the plaintiff in error and the defendant in error was to obtain higher prices for his produce, in order that the plaintiff in error in common with other producers should share in the benefit to his business which would be realized from receiving the true value of his products. The circumstances of this case differentiate it from the four classes generally recognized by text-books and each of which has been dealt with previously by this court.

"It has been said that contracts in partial restraint of trade have been upheld when they are agreements : (1) by the seller of property or business, not to compete with the buyer in such a way as to derogate from the value of the property or business sold; (2) by a retiring partner, not to compete with the firm; (3) by a partner, pending the partnership, not to do anything to interfere, by competition or otherwise, with the business of the firm; (4) by the buyer of property, not to use the same in competition with the business retained by the seller; and (5) by an assistant, servant, or agent, not to compete with his master or employer after the expiration of his time of service. Still an agreement in restraint of trade need not fall within these divisions, to be valid." 13 C. J. 468, § 411. U. S. v. Addyston Pipe Co., 85 Fed. 271 (46 L. R. A. 122, 29 C. C. A. 141). After providing the tests to which we have already referred, the rule in the *Rakestraw* case declares that if "the restraint contracted for appears to have been for a just and honest purpose for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them and not specially injurious to the public, the restraint will be held valid." This court and all other courts, as far as we have been able to find, have recognized a distinction, ofttimes controlling, between a contract which is in partial restraint of trade and a contract which is wholly in restraint of trade. In the *Rakestraw* case this court recognized this distinction and stated, in the quotation last made, instances under which a contract only partially in restraint of trade may nevertheless be valid and binding. The con-

tract before us is made in strict conformity with the permission and provisions of the co-operative marketing act; it "appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed" (or at least it does not lie in his mouth to say to the contrary, because he asserted this to be the truth both in his application for membership and in the contract agreeing to sell all his products). For this reason the contract is "reasonable as between them." The last provision contained in the quotation from the *Rakestraw* case states that if the "restraint contracted for . . is not specially injurious to the public, the restraint will be held to be valid." In view of the fact that the contract is in strict accord with the act passed by the General Assembly, and this act, as we have held, is not unconstitutional, we can not hold, under the record before us, that the contract is "specially injurious to the public." The words "the public" as here used, since the jurisdiction of the State of Georgia does not extend beyond its territorial limits, can apply only to the people of Georgia; and this court is not prepared to hold as a matter of law that a contract which might even have the effect of causing the members of the Cane Growers Co-operative Association to receive more for their products than they have in the past would be inimical to the citizens of Georgia as a whole.

This State is largely agricultural. Agriculture forms the biggest element of its earnings and increased wealth. It must contribute more largely than anything else to the future prosperity of our State. Agricultural prosperity in the future may be largely dependent upon diversification, and a State policy of attracting part of our agricultural population to the production of cane rather than cotton might afford a necessary stimulus to the production of cane. Various considerations well understood by those versed in agriculture, of which the legislature had the right to take notice, may have induced it to hold that this partial restraint of trade would be really beneficial to the public interest. For this reason it does not appear to me "that the restraint contracted for" is "specially injurious to the public interest," and the contract must be held to be "supported by a sufficient consideration," and that the restraint is reasonable. Speaking in Horner *v.* Graves, 7 Bingham, 743, Mr. Chief Justice Tindall said: "We do not see how a better test can be applied to the question whether reasonable or

not, than by considering whether the restraint is such only as to afford a fair protection to the interest of the party in whose favor it is given, and not so large as to interfere with the interest of the public. Whatever restraint is larger than necessary to the protection of the parties can be of no benefit to either; it can only be oppressive; and if oppressive, it is in the eye of the law unreasonable. Whatever is injurious to the interest of the public is void on the ground of public policy." Having held that the restraint has not been shown to be so large as to interfere with the interests of the public, it seems clear that the restraint is no greater than is necessary to afford fair protection to the interests of the association. The purpose of that association, as stated in the caption of the act under which it was given its being, is to foster agriculture, provide a stable market, and thereby produce better prices than heretofore for the growers of cane in southwest Georgia. The purpose of the associations would be entirely defeated by any other method of conducting their business than that which is dependent upon the contract. Unless the association can control within its territory a sufficient amount of the cane produced to affect the price and produce better prices and effect savings in distribution by holding its syrup until such times as may be most advantageous to sell, it can neither stabilize the market nor produce a higher price. Experience has shown that farmers are compelled by their necessities to sell their products as soon as produced, in order to pay debts which are due. The provision which allows the association to remove this cause of depression by advancing its members sums to discharge liens and other pressing obligations, so that the product can be held, and by the credit of the association providing its members with a credit which they perhaps do not possess, would seem would produce a new era in the fostering of agriculture. Such a new era was badly needed, in the opinion of the General Assembly; and for myself, I concur in the view of the General Assembly.

Manifestly the General Assembly can not by the passage of an act make lawful that which is forbidden by the constitution. But, as said by this court, "in all independent States and nations absolute power rests somewhere. In this country it is neither lodged with the executive nor the legislative nor the judicial branches of the government, nor with all combined; but sovereignty rests with

the people of the several States. The ultimate source of legislative power is traceable to them; and in their sovereign capacity they have a right to frame laws for their own government, and for the regulation of human conduct on all matters over which exclusive power has not by them been delegated to the Federal government. Acting in their organized capacity, and under the forms of existing laws, they can rend asunder all bonds that are thrown around individual action, unbridle liberty, and make license as free as the winds of heaven, and as wild as the waves of the sea. They can, on the other hand, so frame their organic and statute law as to place upon their own necks a yoke as galling as ever serf carried under the edict of a despot. It is eminently in this sense that we live under a free government, which simply means a government created by the people, and which they are absolutely free to change or modify at their pleasure." *Plumb* v. *Christie,* 103 *Ga.* 686, 693 (30 S. E. 759, 42 L. R. A. 181). Any legislation which offends this organic law emanating from the sovereign power of the people is void, and it is the duty of the courts to declare laws which offend the constitution to be unconstitutional. The ban of our constitution is upon legislation and contracts which may "encourage monopoly." But the constitution does not define the term "monopoly," and its definition must be supplied by the courts. Not that a State may not create a monopoly; for it has often been held that this power is within the rights of a State. In the case last cited it was said: "It has often been held that monopolies may be created, even in such business as may fall within the ordinary callings of life, where an indiscriminate conduct thereof by individuals under certain circumstances and in certain places might be injurious to the common welfare. These principles are fully discussed in Tiedeman's Limitations of Police Power, § 105." Also: "There is some conflict of authority upon the right of a legislature or a municipality to create a monopoly in a business legal per se, and which requires no license from the State in order to enable individuals to engage therein; but the weight of authority as well as reason seems to us to sustain the view that wherever such a power is exercised in the interests of the public health or morals, it is legitimately within the police powers of a State." If this is true ordinarily, with how much greater force will the doctrine apply to an industry recognized everywhere as one which the public wel-

fare demands should be continuously under the control and police regulation of the government. As an instance that this principle is fully recognized in this State, we need only point to the amendment of 1912 to article 7, section 2, paragraph 2, of the constitution, whereby an exception is made in behalf of the farmers of this State, in that farm products, raised by them in a preceding year and which they wish to hold until a better market will enable them to procure a higher price, are specially exempt from taxation, although all other forms of property are subject to taxation. The amendment is as follows: "The General Assembly shall further have power to exempt from taxation farm products, including baled cotton, grown in this State and remaining in the hands of the producer, but no longer than for the year next after their production." Civil Code (1910), § 6554. Here is an amendment to the constitution placing the produce of the farmer, while in his hands as the producer, in the same place of exemption as are places of religious worship, burial grounds, and charitable institutions, and restricting exemption to one class, the producers; for the same property in the hands of buyer, manufacturer, or other person is subject to taxation.

With the power of the State relating to agriculture thus defined and apparent, and with the term "monopoly" left undefined in article 4, section 2, paragraph 4, of the constitution, speaking for myself, I am prepared to hold that section 23 of the co-operative marketing act is not unconstitutional because it creates a monopoly, or because the association may operate in restraint of trade. The primal question is, has the legislature the right to accomplish the result of fostering agriculture, providing an orderly mode of marketing agricultural products? If so, the doctrine stated by Mr. Justice Miller in the Slaughter-House Cases, 16 Wall. 64 (supra), applies, "that wherever a legislature has the right to accomplish a certain result, and that result is best attained by means of a corporation, it has the right to create such a corporation, and to endow it with the powers necessary to effect the desired and lawful purpose," and that the proposition just quoted "seems hardly to admit of debate."

6. However, even were the co-operative marketing act unconstitutional, the plaintiff in error here is not in position to take advantage of that fact. He was one of the signers of the articles

of incorporation, and thereby became a member of the Cane Growers Association. If the act is discriminatory, he, as a member and officer of the association, belongs to the class in favor of which the alleged discrimination is made. He is not in position to assert that he is injured by the discrimination. The doctrine is well stated in 19 Ruling Case Law, 109, as follows: "As has been often pointed out, one who seeks to set aside a State antitrust statute as repugnant to the Federal constitution must show that he is within the class with respect to whom the act is unconstitu-- tional, and that the alleged unconstitutional feature injures him. The objection that such a statute unlawfully discriminates in favor of certain classes can not be raised by a member of the favored class, nor by any one not affected by the invalid portion of the act." In Plymouth Coal Co. *v.* Pennsylvania, 232 U. S. 531, 532, 545 (34 Sup. Ct. 359, 58 L. ed. 713), it was held that "One attacking the constitutionality of a State statute must show that he is within the class whose constitutional rights are injuriously affected by the statute." The cases of Southern Railway Co. *v.* King, 217 U. S. 524, 534 (30 Sup. Ct. 594, 54 L. ed. 868), Standard Stock Food Co. *v.* Wright, 225 U. S. 540, 550 (32 Sup. Ct. 784, 56 L. ed. 1197), and Rosenthal *v.* New York, 226 U. S. 260, 271 (33 Sup. Ct. 27, 57 L. ed. 212, Ann. Cas. 1914D, 71), were cited in support of this rule. Subsequently, in Mallinckrodt *v.* Missouri, 238 U. S. 41, 54 (35 Sup. Ct. 671, 59 L. ed. 1192), the United States Supreme Court held: "As has been often pointed out, one who seeks to set aside a statute as repugnant to the Federal constitution must show that he is within the class with respect to whom the act is unconstitutional, and that the alleged unconstitutional feature injures him." In Owen County Society *v.* Brumback, 128 Ky. 137 (107 S. W. 710), the Supreme Court of Kentucky held that "If it [the act] could be held to be discriminatory, it is clear that that question can not be raised by the defendant. He has not been discriminated against. He has not been denied any privilege or immunity that is granted to any other person or class of persons, nor has he been denied the equal protection of the law." The proceeding in the Kentucky case was under a co-operative marketing act, such as that now before us. The co-operative association there sued a grower member for injunction upon his failure to deliver tobacco. The plaintiff asso-

ciation was organized under the Kentucky law which permitted farmers co-operative contracts of the same nature as the contract here involved. To the same effect is the decision of the Supreme Court of North Carolina in St. George v. Hardy, 147 N. C. 88 (60 S. E. 920), where the court held that since the party making the attack was not within a class discriminated against, it would not listen to his contentions. Since the plaintiff in error is a member of the Cane Growers Association, he can not attack the constitutionality of the law under which it was organized. "It is a well established general rule that where one contracts with an alleged corporation as such, and in such manner as to recognize its corporate existence de jure or de facto, he will be estopped to deny the fact thus admitted." 7 R. C. L. 105; Casey v. Galli, 94 U. S. 680 (24 L. ed. 307); Cahall v. Citizens' Association, 61 Ala. 232; In re Western Bank Co., 163 Fed. 713; Weinman v. Railway Co., 118 Pa. 192 (12 Atl. 288). The same doctrine is asserted in McDonald v. Alabama Ins. Co., 85 Ala. 401 (5 So. 120), and in Beach v. Co-operative Savings Association, 10 S. D. 549 (74 N. W. 889). In this case the plaintiff association has done business, incurred obligations, and made contracts, all for the benefit of its members. Those who have contracted with the association and any who may have become creditors have done so upon the faith of its legal organization. It follows that Harrell, being a member of the Cane Growers Association, can not attack the law of its creation. The courts will not listen to one who has helped organize this association, who has by his express contract (as appears from paragraph 18-a of the marketing agreement) stated that "this contract is one of a series, dependent for its true value upon the adherence of each and all of the growers to each and all of said contracts," and who now attempts to deny the legal existence of the very thing which was called into being by his active assistance. To each and all of the stipulations of the contract relating to remedial procedure or to the expenses of the litigation, he has already agreed to be bound. This statement includes an agreement to an injunction and to a decree for specific performance.

BECK, P. J. I concur in the principle of law stated in the sixth division of the concurring opinion of the Chief Justice; and that being true, do not think it is necessary to pass upon the other constitutional questions of law. I also concur in the rulings made

upon the other issues in the case not involving constitutional questions; and consequently I concur in the judgment rendered.