313 Ga. 375
FINAL COPY

S21A1261, S21A1262, S21X1326, S22X0007. BLACK VOTERS MATTER FUND, INC. et al. v. KEMP et al.; and vice versa (four cases).

S21A1263. SAUNDERS v. KEMP et al.

ELLINGTON, Justice.

On March 25, 2021, Governor Brian Kemp signed into law Senate Bill 9 ("SB 9"), which created from the former Augusta Judicial Circuit two new judicial circuits: the Columbia Judicial Circuit, comprised of Columbia County, and the Augusta Judicial Circuit, comprised of Burke and Richmond Counties. The judicial circuit split, which was slated to become effective on July 1, 2021, was briefly stayed by three lawsuits challenging the constitutionality of SB 9. The lawsuits were filed in the Superior Court of Richmond County, one by Columbia County citizen Willie Saunders and two by the nonprofit, voting advocacy organization, Black Voters Matter Fund, Inc. ("BVMF"). At the heart of each of

these suits is an assertion that Columbia County officials sought to form their own judicial circuit as a racially discriminatory reaction to the election of District Attorney Jared Williams in November 2020. Williams is the first African American elected as District Attorney for the former Augusta Judicial Circuit. He continues in that office in the new Augusta Judicial Circuit.

These appeals and cross-appeals arise from the trial court's July 13, 2021 final judgment addressing the merits of the appellants' challenges to SB 9 in each of the three suits. After an evidentiary hearing, the trial court rejected the appellants' challenges to SB 9, declaring it "valid and enforceable" and allowing the circuit split to proceed. However, as explained more fully in Division 1 below, we vacate the trial court's judgment as to BVMF and remand those cases to the trial court with instruction that they be dismissed because BVMF lacks standing to pursue its actions. As to Saunders, we do not reach the merits of his appeal because, as explained in Division 2 below, Saunders failed to challenge the trial court's dispositive ruling dismissing the defendants he sued.  Thus, we also

vacate the judgment as to Saunders's complaint and direct the trial court to dismiss his action upon remand.

The facts pertinent to the resolution of these appeals are as follows. On April 28, 2021, Saunders filed a verified complaint against Governor Kemp and the counties comprising the former Augusta Judicial Circuit (Burke, Columbia, and Richmond, collectively, "the Counties"). Saunders asserted a claim for declaratory relief against Governor Kemp and a claim for injunctive relief against the Counties.[1] On June 14, BVMF filed an unverified

---

[1] In Richmond County Case No. 2021RCCV00277, Saunders averred that SB 9 was unconstitutional because it violated (1) "Section 2 of the Voting Rights Act, 52 USC §10301 et seq.; 42 USC §1983, the Due Process Clause of the United States Constitution and the Due Process Clause of the Georgia Constitution" (Count 1); (2) "the Separation of Powers Doctrine set forth in the Georgia Constitution, Article I, Section 2, Paragraph II" (Count 2); (3) "the provisions of the Due Process Clause of the Georgia Constitution and the provision of Article II, Section 1, Paragraph III of the Georgia Constitution" by "nullifying" votes for District Attorney Williams (Count 3); and (4) "the Due Process Clause of the Georgia Constitution" by denying the voters of the Augusta Judicial Circuit the opportunity to fill a vacant judicial seat (Count 4). Saunders prayed that the superior court declare SB 9 unconstitutional and that the Counties be "enjoined and . . . permanently restrained from distributing funds or taking additional action to create a separate judicial [c]ircuit for Columbia County, Georgia[,] and . . . a judicial [c]ircuit for Burke County and Richmond County, and from taking any actions to separate the Augusta Judicial Circuit."

complaint ("*BVMF I*") that was virtually identical to the Saunders suit and which sought the same relief against the same defendants.[2] In *BVMF I*, BVMF alleged that it is a nonprofit Georgia corporation that represents the voting interests of African American voters in the Counties.

BVMF thereafter filed a motion to consolidate *BVMF I* with Saunders's suit. On June 28, BVMF amended its original complaint in *BVMF I*, purporting to add the State of Georgia as a defendant.[3] BVMF also alleged that it is a "nonprofit organization registered in the State of Georgia whose purpose and mission is to promote and protect the voting rights of Black voters in Georgia through grass roots campaigning, public relations, political endorsements, lobbying, and litigation."

---

[2] In Richmond County Superior Court Case No. 2021RCCV00336, BVMF asserted essentially the same grounds for relief (though framed in three counts) that Saunders asserted in Case No. 2021RCCV00277. It also sought the same declaratory and injunctive relief against the same defendants.

[3] In its first amended complaint, BVMF also added two new claims for relief. It alleged that SB 9 constituted a bill of attainder (Count 5) and that SB 9 violated Title VI of the Civil Rights Act of 1964 (Count 6). BVMF asked the superior court to declare SB 9 unconstitutional and to enjoin both Governor Kemp and the Counties from taking action to effectuate the judicial circuit split.

After a June 30 hearing addressing various motions, the trial court entered orders consolidating the *BVMF I* and *Saunders* actions. Also on June 30, the trial court dismissed Saunders's claim for declaratory relief, but not his claims for injunctive relief. And the trial court extended the temporary restraining order against the defendants, amending it to include the State of Georgia. On July 8, BVMF filed a second amended complaint in the consolidated actions. This complaint was verified. In this complaint, BVMF alleged for the first time that it "has citizens in Georgia as members, including members in the Augusta Judicial Circuit." BVMF, however, did not identify any of those members or allege that they were eligible voters. In its response and special appearance, as well as in its motion to dismiss, the State asserted a number of defenses, including that BVMF lacked standing to sue and that service of process on the State was insufficient.

On July 6, BVMF filed a separate verified complaint for declaratory relief against the State of Georgia only ("*BVMF II*"). In this complaint, BVMF asserted the same grounds for declaratory

relief that it had asserted in its prior action.[4] BVMF did not move to consolidate its second complaint with the two previously consolidated actions, nor did the trial court enter such an order. The court's final order, however, reflects that its final judgment was entered in all three actions.

On July 7, upon granting applications for discretionary appeal brought by Governor Kemp and the State of Georgia from an order of the trial court granting a temporary restraining order in the consolidated actions, this Court directed the trial court to hold a hearing to consider the following:

> At the hearing, the trial court shall receive and consider evidence and argument from the parties pertaining to at least the following issues:
> (1) Whether at least one plaintiff has direct or associational standing to assert each of the claims;
> (2) Whether sovereign immunity, as defined and waived by current constitutional and statutory provisions, bars some or all of plaintiffs' claims; and
> (3) Whether plaintiffs have sued the proper

---

[4] In Richmond County Case No. 2021RCCV00381, BVMF asserted six "theories of relief" supporting its claim for declaratory relief, theories that mirrored the six counts asserted in Case No. 2021RCCV00336. BVMF also asked the court to order "that the State of Georgia be temporarily enjoined and restrained and permanently restrained from taking action to effectuate Senate Bill Number 9 and create a separate judicial circuit for Columbia County."

defendants.

In addition, in ruling upon an interlocutory injunction, the trial court shall apply the four-part test our case law articulates:

> An interlocutory injunction should not be granted unless the moving party shows that: (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

*City of Waycross v. Pierce Cty. Bd. of Comm'rs*, 300 Ga. 109, 111 (1) (793 SE2d 389) (2016) (quoting *Bishop v. Patton*, 288 Ga. 600, 604-605 (3) (a) (706 SE2d 634) (2011)).

On July 12, 2021, the trial court conducted an evidentiary hearing addressing the merits of the claims asserted in the consolidated actions (*Saunders* and *BVMF I*) and in *BVMF II*, which had been filed just six days before the hearing. The trial court did not follow all of this Court's instructions; instead, it announced at the outset of the hearing that it intended to address first "whether

7

Senate Bill 9 is void or valid."[5] After receiving documentary evidence and witness testimony on that issue, the trial court summarily rejected arguments pertaining to whether BVMF or Saunders had satisfied their burden of establishing standing to sue and whether the named defendants were proper parties.[6] Instead, without explaining its reasoning, the trial court held that the State was the only proper defendant in the cases, that BVMF and Saunders had standing to sue, and that BVMF had perfected service of process on the State of Georgia.[7] At the end of the hearing, the trial court orally

[5] At the beginning of the hearing, the State asserted that BVMF's second suit against the State, *BVMF II*, violated the "prior pending action doctrine," which prohibits the simultaneous prosecution of two actions by the same plaintiff against the same party. See OCGA § 9-2-5. The court rejected this argument, stating: "I'm not going to grant it. . . . I understand some of the technicalities that are going on in this case but [the Supreme Court wants this case] resolved."

[6] For example, when counsel for the State attempted to argue that the evidence adduced at the hearing showed that BVMF lacked members, the trial court told counsel: "I've already ruled that they've got standing[,] so don't go there." Similarly, the court rebuffed counsel's efforts to argue that BVMF failed to perfect service on the State, stating: "I said I was going forward on the case," but then abruptly held: "I find [that service] was proper."

[7] In its responsive pleadings and motions to dismiss in the consolidated actions, as well as in its statements to the court during the evidentiary hearing, the State asserted several defenses, including: (1) BVMF lacked standing to bring any of the claims asserted against the State in either of its actions, and (2) neither Saunders nor BVMF had properly served the State with process in

ruled in favor of the State on the merits, finding that SB 9 did not violate the federal or state Constitution or any provision of federal or state law, as variously alleged by Saunders and BVMF.

On July 13, 2021, the trial court entered a written order memorializing most of its rulings.[8] In addition to ruling that the appellants' legal challenges lacked merit, the court summarily concluded that the State of Georgia was the only proper defendant, and it dismissed all of the remaining defendants. The court also summarily concluded that Saunders and BVMF had "standing to assert an action for [d]eclaratory [j]udgment."

Saunders, in Case No. S21A1263, and BVMF, in Case Nos. S21A1261 and S21A1262, appealed from this order, arguing that the trial court erred in concluding that SB 9 was valid and enforceable. Neither Saunders nor BVMF asserts in their appellate briefs that the trial court erred in dismissing Governor Kemp and the Counties

---

the consolidated actions. There is no evidence in the record that the State waived any of its defenses in this or in any prior hearing.

[8] In its written order, the trial court did not address whether BVMF had perfected service on the State of Georgia.

from the consolidated actions. The State cross-appealed in Case Nos. S21X1326 and S22X0007, asserting, among other things, (1) that the trial court erred in ruling that BVMF had standing to pursue its claims; and (2) that the appellants had failed to perfect service of process on the State in the consolidated actions.[9] Because we agree with the State that the trial court should have dismissed these three suits, we do not address the claims of error raised in Saunders's or BVMF's appellate briefs.

*Case Nos. S21A1261 and S21A1262*

1. In its appellate briefs, BVMF challenges the trial court's ruling that SB 9 was valid and enforceable. The State, however, contends that the trial court erred in reaching the merits of BVMF's claims because BVMF lacked standing to sue the State on any of the

---

[9] Governor Kemp joined in the State's cross-appeal in Case No. S22X0007, arguing, among other things, that the doctrine of sovereign immunity barred all claims against him in his official capacity and that he was never served in his individual capacity. Because the Governor was dismissed as a defendant and the appellants do not challenge that ruling, we do not reach the Governor's claims of error.

10

claims asserted in *BVMF I* or *BVMF II*.[10] We agree.

Under Georgia law, a trial court lacks subject matter jurisdiction to address the merits of a constitutional challenge to a statute brought by a party who does not have standing to bring that challenge. See *Parker v. Leeuwenburg*, 300 Ga. 789, 790 (797 SE2d 908) (2017) ("[S]tanding . . . is a jurisdictional issue[.]"); *Blackmon v. Tenet Healthsystem Spalding, Inc.*, 284 Ga. 369, 371 (667 SE2d 348) (2008) ("[A] plaintiff with standing is a prerequisite for the existence of subject matter jurisdiction."); *Perdue v. Lake*, 282 Ga. 348, 348 (1) (647 SE2d 6) (2007) ("[S]tanding must be determined at the time at which the plaintiff's complaint is filed in order to place an actual case or controversy within the purview of the court." (citations and punctuation omitted)). Additionally, a trial court's lack of subject matter jurisdiction "cannot be waived and may be

---

[10] In its final judgment, the trial court did not specify whether it ruled that BVMF had standing to sue in its own right (organizational standing) or as a representative of its purported members (associational standing). The court stated only: "Both Willie Saunders and Black Voters Matter Fund have standing to assert an action for [d]eclaratory [j]udgment." We consider the issue of BVMF's standing under both theories.

raised at any time either in the trial court, in a collateral attack on a judgment, or in an appeal." (Citation and punctuation omitted.) *Abushmais v. Erby*, 282 Ga. 619, 622 (3) (652 SE2d 549) (2007).

"As a general rule, a litigant has standing to challenge the constitutionality of a law only if the law has an adverse impact on *that litigant's own rights*." (Emphasis supplied.) *Feminist Women's Health Center v. Burgess*, 282 Ga. 433, 434 (1) (651 SE2d 36) (2007). However, this Court has also recognized the right of an association to bring suit on behalf of its members. See *Aldridge v. Ga. Hospitality & Travel Assn.*, 251 Ga. 234, 236 (1) (304 SE2d 708) (1983). To avoid dismissal of its claims or actions based on a lack of standing, BVMF, as the party invoking the jurisdiction of the court, had the burden of demonstrating that it had either direct or associational standing to sue. See, e.g., *New Cingular Wireless PCS, LLC v. Dept. of Revenue*, 308 Ga. 729, 732 (843 SE2d 431) (2020) (A party "must establish standing to sue on the ground asserted, which requires showing an injury in fact that was caused by the breach of a duty owed by the defendants to the plaintiffs and that will be

12

redressed by a favorable decision from the court." (citations and punctuation omitted)); *Dept. of Human Resources v. Allison*, 276 Ga. 175, 178 (575 SE2d 876) (2003) ("The burden of proving the interest necessary to demonstrate a particular party's standing is ordinarily placed on that party.").

A trial court's determination on the issue of standing will not be disturbed unless its factual determinations are clearly erroneous; however, the trial court's application of law to the facts is subject to de novo appellate review. *In re Haney*, 355 Ga. App. 658, 658 (845 SE2d 380) (2020) ("Under Georgia law, a trial court's decision with respect to standing will not be reversed absent clear error, although we review de novo any questions of law inherent in that decision." (citation and punctuation omitted)). See also *Stuttering Foundation, Inc. v. Glynn County*, 301 Ga. 492, 503 (2) (b) (801 SE2d 793) (2017) ("A trial court's determination on the issue of standing in a zoning case will not be disturbed unless its factual determinations are clearly erroneous.").

(a) *BVMF does not have direct organizational standing.* Under

Georgia law, "[t]here is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy[.]" (Citation and punctuation omitted.) *Sawnee Elec. Membership Corp. v. Ga. Dept. of Revenue*, 279 Ga. 22, 22 (1) (608 SE2d 611) (2005).[11] Organizational standing, as opposed to associational standing, does not depend on the standing of an organization's members; instead, organizational standing permits an organization to sue in its own right if it meets the same standing test applicable to individuals. Thus, to maintain an action challenging the constitutionality of SB 9 on this basis, BVMF must establish standing to sue on the grounds asserted, which requires showing (1) an injury in fact, (2) a causal connection between the injury and the alleged wrong, and (3) the likelihood that the injury

---

[11] Under federal standing law, a corporation may challenge a government regulation that causes it economic injury, see *Arnold Tours, Inc. v. Camp*, 400 U. S. 45, 46 (91 SCt 158, 27 LE2d 179 (1970) (per curiam), and may also sue a government for injuring its constitutional rights, see *Susan B. Anthony List v. Driehaus*, 573 U. S. 149, 158 (134 SCt 2334, 189 LE2d 246) (2014).

will be redressed with a favorable decision. See *New Cingular Wireless*, 308 Ga. at 732; *Granite State Outdoor Advertising, Inc. v. City of Roswell*, 283 Ga. 417, 418 (1) (658 SE2d 587) (2008). An "injury in fact" is one that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." (Citations and punctuation omitted.) *Center for a Sustainable Coast, Inc. v. Turner*, 324 Ga. App. 762, 764 (751 SE2d 555) (2013). See also *Women's Surgical Center, LLC v. Berry*, 302 Ga. 349, 351 (1) (806 SE2d 606) (2017) ("[A] party has standing to pursue a declaratory action where the threat of an injury in fact is 'actual and imminent, not conjectural or hypothetical.'") (citation omitted)); *Manlove v. Unified Government of Athens-Clarke County*, 285 Ga. 637, 638 (680 SE2d 405) (2009) (A litigant has standing to challenge a law "only if the law has an adverse impact on that litigant's own rights," which means that the litigant must establish a "threat of injury in fact" that is "'actual and imminent, not conjectural or hypothetical.'"). Cf. *Cheeks v. Miller*, 262 Ga. 687, 688 (425 SE2d 278) (1993) ("A controversy is justiciable when it is definite and concrete, rather

than being hypothetical, abstract, academic, or moot."). On the record before us, BVMF cannot establish that it has direct organizational standing to sue because BVMF has not shown that it suffered an injury in fact as a result of the passage of SB 9.

BVMF is a nonprofit corporation. It is not a person entitled to vote in the Augusta Judicial Circuit.[12] Further, the fact that BVMF's corporate mission includes an interest in advocating for the rights of Georgia voters by engaging in litigation does not, in and of itself, give it direct standing to challenge SB 9, as if it were a voter. See *GeorgiaCarry.Org, Inc. v. Allen*, 299 Ga. 716, 717-718 (791 SE2d 800) (2016) ("[T]he fact that Georgia Carry may claim to have an 'interest' in the offices held by the [Code Revision] Commission members does not transform Georgia Carry into a 'person' [entitled

---

[12] As we have explained, "the denial of the right [to elect public officials] is such an injury to the *personal* right of any voter as would authorize him to attack the constitutionality of an act" used by officials to justify refusing to hold required elections. (Emphasis supplied.) *Manning v. Upshaw*, 204 Ga. 324, 327 (2) (49 SE2d 874) (1948). See also *Barrow v. Raffensperger*, 308 Ga. 660, 660, 678 (842 SE2d 884) (2020) (A Georgia voter has a right to pursue a mandamus claim to enforce the Georgia Secretary of State's duty to conduct an election that is legally required.).

to bring an action for quo warranto] under OCGA § 9-6-60.").[13]

We note that we asked the parties to provide supplemental briefing on the federal "diversion of resources theory" of standing, whether other states have accepted or rejected it, and whether, as a matter of Georgia law, an organization may have standing to sue based solely on a "diversion of resources" theory. While the parties have correctly observed that there is no Georgia precedent directly addressing the "diversion of resources" theory and that this Court has, in the past, cited federal cases on the issue of standing, we are not bound to follow federal standing law. Standing is a question of judicial power to adjudicate a dispute, and the text, history, and precedents relating to judicial power under the Georgia Constitution and the United States Constitution are not identical. With that in mind, we must determine whether, under Georgia law, BVMF sustained an actual injury to its own interest that was fairly

---

[13] Under federal standing law, an organization must show a concrete injury to the organization's activities and not simply a setback to the organization's abstract social interests. See *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 379 (102 SCt 1114, 71 LE2d 214) (1982).

17

traceable to the passage of SB 9.

Fundamentally, BVMF's argument in support of the application of a "diversion of resources" theory of standing is that the passage of SB 9 frustrated its voter advocacy mission because it was compelled to challenge the constitutionality of SB 9, and in doing so, it diverted resources it would have otherwise directed to other advocacy efforts.[14] BVMF contends that this diversion of resources and consequent frustration of certain aspects of its mission is an injury sufficient to establish standing under federal and state law. Even assuming that a "diversion of resources" theory like that in federal law exists under Georgia law, we do not believe that BVMF's allegations support standing under such a theory.

The seminal federal "diversion of resources" theory case is

---

[14] In its second amended complaint, which was verified, BVMF averred that its mission is to promote and protect the voting rights of Black voters in Georgia through grass roots campaigning, public relations, political endorsements, lobbying, and litigation. In furtherance of these goals, it allocates its limited financial resources, staff, and volunteers to activities like text and phone campaigns, voter registration drives, and grass roots campaign and protest events. BVMF alleged: "As a result of [the State's] illegal actions herein, [BVMF] has had to divert funds away from the activities listed . . . in order to pay for the costs associated with the litigation herein."

*Havens Realty Corp. v. Coleman*, 455 U. S. 363, 379 (102 SCt 1114, 71 LE2d 214) (1982). In that case, the plaintiff organization, Housing Opportunities Made Equal ("HOME"), alleged that Havens, a real estate company, steered African American applicants, but not white applicants, away from its apartments. See 455 U. S. at 368. HOME, a nonprofit organization whose purpose was "to make equal opportunity in housing a reality in the Richmond[, Virginia,] Metropolitan Area," id., alleged that it was injured because Havens's racial steering practices had frustrated its counseling and referral services and, consequently, served as a drain on its resources. Litigation was not a part of HOME's mission. See id. at 369. HOME alleged:

> Plaintiff HOME has been frustrated by [Havens's] racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract [Havens's] racially discriminatory steering practices.

(Punctuation omitted.) Id. at 379. Based on these allegations, the United States Supreme Court held:

19

> If, as broadly alleged, [Havens's] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests[.]

Id. HOME therefore had organizational standing under federal law.

In the years since *Havens* was decided, a split has developed in the federal appellate courts as to whether simply diverting resources to address an alleged wrong constitutes an injury in fact under a "diversion of resources" theory.[15] Some federal courts have interpreted *Havens* broadly, allowing an organization to show injury in fact by showing only that the organization diverted resources from its mission-oriented programs to activities intended to combat

---

[15] See *Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 Fed. Appx. 469, 473-475 (6th Cir. 2006) ("The circuit courts differ, however, on the extent to which they will consider injury related to litigation in reviewing standing. Several courts have taken a more restrictive approach, holding that to show standing, an organization must demonstrate that it suffered a concrete injury that is completely independent from the economic and non-economic costs of the litigation. . . . Other circuits take a more lenient approach, allowing organizations to prove standing by showing that they diverted resources toward litigation to counteract the defendant's [actions]." (footnote omitted)).

the defendant's allegedly wrongful conduct, including litigation. For example, the Eighth Circuit Court of Appeals has held that an organization can show an injury in fact in order to have standing to bring suit by demonstrating that it deflected resources from its mission-oriented efforts to legal efforts aimed at combating the defendant's conduct. See *Arkansas ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*, 160 F3d 433, 434 (8th Cir. 1998) (a deflection of resources from a fair housing promotion organization's counseling or educational programs to legal efforts under the Fair Housing Act to combat the defendant's discrimination against homebuyers was sufficient to constitute an injury).[16]

---

[16] See also *Moya v. U. S. Dept. of Homeland Security*, 975 F3d 120, 130 (2d Cir. 2020) ("[A] plaintiff needs to allege only some perceptible opportunity cost from the expenditure of resources that could be spent on other activities." (citations and punctuation omitted)); *Florida State Conference of NAACP v. Browning*, 522 F3d 1153, 1166 (11th Cir. 2008) (Even if an organization arguably diverts its resources voluntarily, a court will find organizational standing if the "drain on [the] organization's resources arises from the organization's need to counteract the defendants' assertedly illegal practices [because] that drain is simply another manifestation of the injury to the organization's noneconomic goals." (citations and punctuation omitted)); *Village of Bellwood v. Dwivedi*, 895 F2d 1521, 1526 (7th Cir. 1990) (holding that a fair housing agency can establish standing simply by diverting time and money to legal efforts addressing the defendant's discrimination); *Fair Fight*

21

Other federal courts have interpreted *Havens* narrowly, requiring the organization to show that it has suffered injuries independent of the diversion of resources, particularly when resources are diverted to litigation alone. For example, the Fifth Circuit has held that

> [a]n organization suffers an injury in fact if a defendant's actions "perceptibly impair" the organization's activities and consequently drain the organization's resources. However, an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct. For example, the mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization. Further, the organization's reaction to the allegedly unlawful conduct must differ from its routine activities.

*Action v. Raffensperger*, 413 FSupp.3d 1251, 1267-1268 (N.D. Ga. 2019) (The district court held that the plaintiffs had standing sufficient to withstand a motion to dismiss because they had alleged "reasonably anticipating having to shift resources from general activities to new programs aimed directly at counteracting the activities Defendants allegedly engaged in[.]"); *Black Voters Matter Fund v. Raffensperger*, 478 FSupp.3d 1278, 1302 (II) (A) (N.D. Ga. 2020) (The district court held that "BVMF's allegations and evidence are sufficient to establish injury to the organization under a diversion of resources theory. Plaintiff BVMF has offered evidence that absent an injunction requiring the Secretary of State to provide pre-paid postage for mail in absentee ballots, BVMF's efforts to increase voting by mail in low-income communities of color has likely been adversely affected and will continue to be adversely affected.").

(Punctuation and footnotes omitted.) *El Paso County v. Trump*, 982 F3d 332, 343-344 (5th Cir. 2020).[17]

We believe that the narrower approach is more consistent with the reasoning in *Havens* — which, although not binding, is the seminal federal precedent we examine here. Under our reading of *Havens*, an organization suffers an injury in fact for purposes of standing when the defendant's actions impair the organization's ability to provide its services or to perform its activities and, as a consequence of that injury, require a diversion of an organization's

---

[17] See also *Food & Water Watch, Inc. v. Vilsack*, 808 F3d 905, 919 (D.C. Cir. 2015) ("An organization must allege more than a frustration of its purpose because frustration of an organization's objectives is the type of abstract concern that does not impart standing. . . . [T]o establish [an organization's] standing in its own right, it must have suffered a concrete and demonstrable injury to its activities. Making this determination is a two part inquiry — we ask, first, whether the [defendant's] action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." (citations and punctuation omitted)); *NAACP v. City of Kyle*, 626 F3d 233, 238 (5th Cir. 2010) ("[T]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (citations and punctuation omitted)); *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F3d 71, 80 (3d Cir. 1998) ("[T]he pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III."); *Spann v. Colonial Village, Inc.*, 899 F2d 24, 27 (D.C. Cir. 1990) (An organization may establish Article III standing if it is forced to devote resources, independent of its lawsuit, to address the defendant's actions.).

resources to combat that impairment. But we see no basis in *Havens* to conclude that the diversion of resources to litigation, standing alone, qualifies as an injury sufficient to confer standing on an organization. If simply choosing to engage in litigation were sufficient to confer standing to sue, then any special interest group could manufacture standing to sue by simply asserting an organizational purpose contrary to the issue being litigated and then filing a lawsuit. See *Spann v. Colonial Village*, 899 F2d 24, 27 (D.C. Cir. 1990) (An organization cannot "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.").

Additionally, the broader approach, which BVMF relies on, is inconsistent with the traditional requirement of Georgia standing law that the organization itself suffer an actual, concrete, and particularized injury as a result of a defendant's actions. See, e.g., *Manlove*, 285 Ga. at 638 (An injury in fact must be "imminent" and "concrete."); *Sustainable Coast*, 324 Ga. App. at 764 (An "injury in fact" is one that is both "concrete and particularized" and "actual or

24

imminent, not conjectural or hypothetical." (citations and punctuation omitted)). Moreover, "when the plaintiff is not [itself] the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." (Citation and punctuation omitted.) *Sustainable Coast*, 324 Ga. App. at 765.

Here, there was no evidence at the final hearing that the passage of SB 9 impaired BVMF's ability to carry out its voter advocacy programs. BVMF has not shown how the division of one judicial circuit into two circuits impaired its ability to register voters, to advocate for voting rights, to engage in grassroots campaigns, public relations, mission-oriented litigation, and so on.[18] This is particularly true given that litigation is one of BVMF's stated

---

[18] The case on which BVMF primarily relies does not support its argument. In *Black Voters Matter Fund v. Raffensperger*, the district court found that BVMF's allegations and evidence were sufficient to establish injury to the organization under a broad diversion of resources theory because BVMF offered evidence that, absent an injunction requiring the Secretary of State to provide pre-paid postage for mail-in absentee ballots, it would need to spend thousands of dollars on postage and other advocacy efforts to increase voting by mail in low-income communities of color. See 478 FSupp.3d at 1302 (II) (A). The court did not premise its ruling on the claim that BVMF had to divert resources as a consequence of the lawsuit that it had filed.

25

organizational purposes. Thus, BVMF has not demonstrated how this litigation was necessary to remedy any alleged impairment of its organizational activities. Because BVMF failed to prove that it sustained an actual injury to its own interest that was fairly traceable to the passage of SB 9, BVMF lacks standing to sue in its own right. See *New Cingular Wireless*, 308 Ga. at 732; *Granite State*, 283 Ga. at 418 (1).

(b) *BVMF does not have associational standing.* Because BVMF cannot establish that it has organizational standing to sue in its own right, it must demonstrate that it has associational standing to challenge SB 9. It must prove, among other things, that it was acting in this litigation as a representative of members who suffered an injury traceable to the passage of SB 9. Under Georgia law, associational standing permits an organization that has suffered no direct injury to sue on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

26

(Citation and punctuation omitted.) *Aldridge*, 251 Ga. at 236 (1). See also *Atlanta Taxicab Co. Owners Assn. v. City of Atlanta*, 281 Ga. 342, 344 (2) (638 SE2d 307) (2006). BVMF failed to present evidence satisfying the first prong of this test. BVMF did not show that it has members who are citizens eligible to vote in either the new or the former Augusta Judicial Circuit (and who thus would have standing to sue in their own right). Because voting is a personal right, BVMF was required to do more than establish that it has members. It must establish that it has members who are eligible to vote in the Augusta Judicial Circuit.[19] This it entirely failed to do.

Moreover, BVMF failed to prove that it has any members whatsoever. Although BVMF averred in its verified complaint that it had members who reside in the former Augusta Judicial Circuit, it offered no evidence at the evidentiary hearing to substantiate that averment.[20] The State, on the other hand, presented evidence that

---

[19] See footnote 12 above.

[20] In its second amended complaint, which was verified, BVMF alleged for the first time that it "has citizens in Georgia as members, including

27

BVMF is a nonprofit corporation without members. The State introduced in evidence a certified copy of BVMF's articles of incorporation, a document filed with the Secretary of State's office pursuant to OCGA § 14-2-201. The document expressly stated that "[t]he corporation will not have members." BVMF did not show the trial court that it had amended the articles to add members, much less members who were eligible voters, nor did it identify any

members in the Augusta Judicial Circuit." BVMF asserted in its supplemental appellate brief that it "presented" the trial court with its second amended complaint during the July 12 evidentiary hearing. However, it has not shown this Court by citation to the record where the amended complaint was entered in evidence, and we have not been able to locate any such evidence. Because BVMF did not put its verified allegations into evidence, it did not establish a contested issue of fact at the hearing, where the burden of proof was on BVMF to present admissible evidence, such as proper exhibits or testimony by witnesses with personal knowledge who can be cross-examined. See, e.g., *Sherman v. City of Atlanta*, 293 Ga. 169, 174 (4) (744 SE2d 689) (2013) (At trial, statements in the intervenors' pleadings coupled with a verification were insufficient to establish a contested issue of fact as to the intervenors' standing to object to a bond validation.).

Further, the record does not show that the trial court found that BVMF had members prior to the July 12 evidentiary hearing. We note that, toward the end of the July 12 evidentiary hearing, the trial court, referring to the June 30 motions hearing, stated: "I thought I ruled last week [that BVMF had standing,] but my orders didn't seem to reflect that." The court went on to say: "I found this morning before we started that both of [the defendants] have direct — I was going to read this at the end, direct and associate [sic] standing . . . . So that's established[.]" It is not clear from the hearing transcript from what document the trial court was reading. We have found no evidence in the record or in the transcripts from the June 30 or July 12 hearings to support a finding of fact by the trial court that BVMF has "members."

28

eligible voter who claimed membership in the corporation.

Rather than identifying any specific Burke, Columbia, or Richmond County eligible voter who is a member of BVMF, BVMF argued in its appellate brief that its "members" are any of the voters whom it contends had his or her vote "nullified" by SB 9. This Court has not defined what it means to be a "member" of an association for purposes of demonstrating associational standing. Although the United States Supreme Court has permitted an organization that does not have traditional, voluntary members to assert associational standing, it did not premise such standing merely on the fact that the organization claims to represent the interests of a group of people or business entities. Rather, there had to be specific "indicia of membership." As the Supreme Court explained:

> [W]hile the apple growers and dealers are not "members" of the [Washington State Apple Advertising] Commission[, a state agency,] in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them. In a very real sense, therefore, the Commission

represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests. Nor do we find it significant in determining whether the Commission may properly represent its constituency that "membership" is "compelled" in the form of mandatory assessments. Membership in a union, or its equivalent, is often required. Likewise, membership in a bar association, which may also be an agency of the State, is often a prerequisite to the practice of law. Yet in neither instance would it be reasonable to suggest that such an organization lacked standing to assert the claims of its constituents.

*Hunt v. Washington State Apple Advertising Comm.*, 432 U. S. 333, 344-345 (2) (97 SCt 2434, 53 LE2d 383) (1977).[21] BVMF has not demonstrated any such indicia of membership, nor has it pointed to any persuasive authority embracing a definition of "member" so broad that it would include any person with whom an organization purports to share a common cause. In fact, we have found persuasive authority to the contrary.[22]

---

[21] This Court deemed *Hunt* persuasive authority in adopting its three-part test for associational standing in *Aldridge*. See 251 Ga. at 236 (1).

[22] See, e.g., *Fund Democracy, LLC v. Securities and Exchange Comm.*, 278 F3d 21, 25-26 (D.C. Cir. 2002) (A business that served as an advocate and information resource for mutual fund investors could not claim associational standing, because none of the individuals or groups it claimed to represent

Finally, BVMF's assertion that this Court's decision in *Aldridge* supports its argument that it has satisfied the first prong of the three-part test for associational standing is without merit. In *Aldridge*, this Court did not examine what it meant to be a member of an association, as that issue was not raised. See *Aldridge*, 251 Ga. at 236 (1). Instead, applying the criteria set forth in *Hunt*, we held that the Georgia Hospitality & Travel Association ("GHTA") was an unincorporated voluntary trade association that represented the business interests of its member hotels, motels, restaurants, and various travel-related industries. See id. ("[T]he record clearly demonstrates that GHTA is a zealous advocate of its *members'*

acted as members of the business.); *Sorenson Communications, LLC v. Fed. Communications Comm.*, 897 F3d 214, 225 (D.C. Cir. 2018) (holding that it was unclear that an organization would qualify as a "membership association" for standing purposes when its claimed membership consisted of passive subscribers to its e-mail list and its Facebook followers who did not finance organization's activities or play a role in selecting leadership and 100 percent of financial support was supplied by a co-plaintiff); *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living*, 675 F3d 149, 157-159 (2d Cir. 2012) ("[T]here is no evidence that the individuals with mental illness on behalf of whom [the advocacy organization] brought this case have anything approaching the indicia of membership that is required under *Hunt*, much less that [the organization] functions effectively as a membership organization." (citation and punctuation omitted)).

interests, and has provided adequate representation in this suit."
(emphasis supplied)).

It is plain from the record before us that BVMF has neither identified a specific member of its organization eligible to vote nor shown that the voters it purports to represent qualify as members of BVMF based on any indicia of membership in the organization, such as financing BVMF's activities or electing its leadership. Because BVMF failed to show that it has members eligible to vote, it cannot satisfy the criteria for associational standing; therefore, it lacks standing to sue under that theory. See *Aldridge*, 251 Ga. at 236 (1); *Atlanta Taxicab*, 281 Ga. at 344 (2).

Absent a plaintiff with standing, the trial court lacked subject matter jurisdiction to address the merits of BVMF's complaints. Because BVMF has not established standing to sue in its own right or as a representative of its purported members, these lawsuits should have been dismissed prior to any adjudication on the merits. See *Parker*, 300 Ga. at 790; *Blackmon*, 284 Ga. at 371; *Perdue*, 282 Ga. at 348 (1). Consequently, we vacate the trial court's order as to

BVMF's complaints, and those complaints must be dismissed upon remand to the trial court.

*Case No. S21A1263*

2. In Case No. S21A1263, Saunders challenges the trial court's judgment that SB 9 was valid and enforceable. As noted above, Saunders's complaint named only Governor Kemp and the Counties as defendants. In its final judgment, the trial court ruled that the State of Georgia was the only proper defendant and, on that basis, dismissed Governor Kemp and the Counties. Although this ruling effectively dismissed all of Saunders's claims for relief, he has not challenged this dispositive ruling on appeal. Accordingly, we do not reach the merits of the claims of error Saunders enumerated in his appellate brief. See *Love v. Fulton County Bd. of Tax Assessors*, 311 Ga. 682, 698 (3) (e) (859 SE2d 33) (2021) (Where the trial court did not allow the petitioners to amend their petition to add necessary parties as defendants, which ruling effectively eliminated their claim for a tax refund, and the petitioners did not challenge that ruling on appeal, this Court was not required to address the trial

court's alternative rationale for dismissing the petitioners' claim for a refund.).

The trial court purported to rule on the merits of Saunders's claims, even though no defendant remained in his case. The trial court should have dismissed Saunders's case instead. We therefore vacate the trial court's order as to Saunders's complaint and remand with direction to dismiss the case.

3. Given our holdings in Divisions 1 and 2 above, we need not address the issues raised in the State's cross-appeals. Consequently, we dismiss the cross-appeals as moot.

*Judgments vacated and cases remanded with direction in Case Nos. S21A1261, S21A1262, and S21A1263. Appeals dismissed as moot in Case Nos. S21X1326 and S22X0007. All the Justices concur.*

PETERSON, Justice, concurring.

The Court holds today, as it frequently has, that in order to challenge the constitutionality of a statute, a plaintiff must have "standing." I concur fully in the Court's opinion as a faithful application of our precedent. I write separately with some observations on the lack of clarity in our standing doctrine.

Our jurisdictional requirement of standing may sound familiar from federal constitutional jurisprudence. See, e.g., *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (112 SCt 2130, 119 LE2d 351) (1992). But that federal jurisprudence is based on text in the United States Constitution that qualifies the federal judicial power. See U.S. Const. Art. III, Sec. II, Cl. I (the federal "judicial [p]ower shall extend" only to certain kinds of "[c]ases" and "[c]ontroversies"). No such concrete qualification appears in the Georgia Constitution's only provision that explicitly mentions the state judicial power. See Ga. Const. of 1983, Art. VI, Sec. I, Par. I ("The judicial power of the state shall be vested exclusively in the

35

following classes of courts . . . .").[23] But we nevertheless have standing requirements, too.

Despite the textual difference between the United States and Georgia Constitutions, we have frequently cited federal standing precedent in deciding Georgia cases without actually explaining why federal case law interpreting Article III of the U.S. Constitution should be considered persuasive authority for the different question of Georgia standing law. See, e.g., *Gaddy v. Ga. Dept. of Revenue*, 301 Ga. 552, 555-556 (1) (a) (i) (802 SE2d 225) (2017); *Parker v. Leeuwenburg*, 300 Ga. 789, 792-793 (797 SE2d 908) (2017); *Oasis*

---

[23] The word "case" does appear elsewhere in Article VI of the Georgia Constitution, although only in provisions with limited application. See, e.g., Art. VI, Sec. I, Par. VIII ("Any court shall transfer to the appropriate court in the state any civil case in which it determines that jurisdiction or venue lies elsewhere."); see also generally Art. VI, Sec. II (governing venue for certain types of "cases" and "suits"). And although at least one such provision is about jurisdiction, see Art. VI, Sec. IV, Par. I ("The superior courts shall have jurisdiction in all cases, except as otherwise provided in this Constitution."), other jurisdiction-vesting provisions — even beyond the judicial-power-vesting provision discussed above — do not. See, e.g., Art. VI, Sec. III, Par. I ("The magistrate, juvenile, and state courts shall have uniform jurisdiction as provided by law. Probate courts shall have such jurisdiction as now or hereafter provided by law, without regard to uniformity."); Art. VI, Sec. III, Par. II ("The state-wide business court shall have state-wide jurisdiction as provided by law."). So far as I can tell, we appear never to have considered whether any such provisions might be read as a qualification on any portion of the state judicial power.

*Goodtime Emporium I, Inc. v. City of Doraville*, 297 Ga. 513, 518 (2) (773 SE2d 728) (2015). And from time to time in recent decades, we have announced new rules of Georgia law by adopting wholesale such federal precedent. See, e.g., *Feminist Women's Health Ctr. v. Burgess*, 282 Ga. 433, 435 (1) (651 SE2d 36) (2007) (adopting federal third-party standing doctrine as defined in *Powers v. Ohio*, 499 U.S. 400, 411 (111 SCt 1364, 113 LE2d 411) (1991)); *Bo Fancy Productions v. Rabun Cty. Bd. of Commrs.*, 267 Ga. 341, 344-345 (2) (a) (478 SE2d 373) (1996) (adopting federal doctrine of relaxed standing requirements in First Amendment cases, citing *Freedman v. Maryland*, 380 U.S. 51, 56 (85 SCt 734, 13 LE2d 649) (1965)); *Aldridge v. Ga. Hospitality & Travel Assn.*, 251 Ga. 234, 235-236 (1) (304 SE2d 708) (1983) (adopting federal associational standing doctrine as defined in *Hunt v. Wash. State Apple Advertising Comm.*, 432 U.S. 333, 341 (97 SCt 2434, 53 LE2d 383) (1977)). And in making standing arguments before us, litigants very frequently rely on federal precedent without any attempt to explain why Georgia courts should apply such decisions. (Given our historical tendency to

adopt federal precedent without meaningful analysis, this approach by litigants is understandable, if unhelpful to our efforts to articulate Georgia law in a principled fashion.)

It seems to me well past time to consider the source and nature of Georgia's standing doctrine, and the extent to which our reliance on federal standing jurisprudence really is appropriate in interpreting and applying Georgia standing doctrine.[24] A review of our case law reveals no clear answer to such questions. One clear line of case law — which we properly apply today — holds that persons seeking to challenge a state statute as unconstitutional may do so only if that statute has injured them in some specific way.

---

[24] After further consideration, I have concluded that I was incorrect when I previously suggested that standing requirements derive from our Constitution's grant to this Court of appellate jurisdiction over certain "cases." See *Parker*, 300 Ga. at 793 (Peterson, J., dissenting) (citing Ga. Const. of 1983, Art. VI, Sec. VI, Pars. II, III, & V). Although standing of the kind I discuss in this concurrence is a question of subject-matter jurisdiction, and we also speak of our appellate jurisdiction in terms of subject-matter jurisdiction, they are actually two distinct kinds of jurisdiction. The subject-matter jurisdiction at issue with respect to standing addresses whether *any* Georgia court has the power to decide a case. The subject-matter jurisdiction at issue with appellate jurisdiction addresses a much narrower question: *which* Georgia appellate court — this Court or the Court of Appeals — has the power to decide a particular appeal.

Several subsets of this case law relax the injury requirement in particular circumstances. And a second clear line of cases requires no individualized injury at all so long as the plaintiff seeks to enforce a public, rather than a private, right.

The first line of cases appears, perhaps, to have arisen from considerations of separation of powers. And the second line of cases appears to have arisen in the municipal context by analogizing the rights of taxpayers and citizens of municipal corporations to those of shareholders in private corporations, who can assert the corporation's own rights against its officers and directors in derivative litigation. But it wasn't long before we extended that line of case law — without analysis — well beyond the municipal context. The resulting hodge-podge of precedents leaves me uncertain as to the source and nature of our standing doctrine. Until that uncertainty is resolved, we cannot know how relevant any particular federal precedent is to Georgia standing doctrine.

It seems to me that there are several conclusions to draw from this uncertainty. First, we should stop making new Georgia

standing law based solely on federal law without explaining why that federal law is persuasive in the Georgia context. Second, litigants should stop citing federal case law in making arguments about Georgia standing doctrine without explaining why that case law is persuasive in the Georgia context. Third, our past precedent relying on federal case law — even if wrongly decided — is precedent binding on lower courts, and the principle of stare decisis tells us to apply it ourselves until and unless we overrule it. And, finally, at least some of our precedent that adopted new federal standing doctrines wholesale may warrant reconsideration in an appropriate case.[25]

    1.    *Standing is a necessary prerequisite to challenge statutes as unconstitutional.*

As early as 1884, we recognized that principles underlying the

---

[25] I join in full the Court's application of *Aldridge* in this case, as no party has suggested we reconsider it, the question is not briefed, and ultimately the conclusion is that standing is absent even under *Aldridge*. And the Court's analysis of the federal doctrine of "diversion of resources" expressly does not adopt any such theory as a matter of Georgia law; rather, it concludes that any such decision is unnecessary here, because the only version of the theory that could plausibly give plaintiffs any relief is too broad to be compatible with Georgia law.

separation of powers should also limit occasions on which we determine whether statutes violate the Georgia Constitution to those where such a decision was truly necessary. We gave expression to this principle in several different ways. We first held that

> [c]omity to a co-ordinate department of the government requires, according to many decisions of this and other courts, that causes shall not be disposed of upon constitutional grounds when it is possible to avoid such questions, without a sacrifice of the rights of parties . . . .

*Bd. of Ed. of Glynn County v. Mayor of Brunswick*, 72 Ga. 353, 354-355 (1) (1884). Two years later, we rejected a challenge to a statute and held that only once "the law operates upon the private property of an individual, and that is seized or destroyed or confiscated, or the individual is arrested and indicted thereunder for its violation" can the "portion of the law thus affecting his private property and personal liberty . . . be assailed by him as unconstitutional or illegal[.]" *Scoville v. Calhoun*, 76 Ga. 263, 269 (1886). The reason was again the separation of powers. The courts had to "giv[e] the benefit of doubts to the co-ordinate branches of government" and "never decide laws unconstitutional, if cases can be otherwise

adjudicated." Id. These early decisions — although not about standing — respected the separation of powers by withholding judicial review of the constitutionality of a statute when the case could properly be resolved in some other way.

In 1888, we identified the absence of standing as a threshold matter that foreclosed judicial review. See *Reid v. Mayor, Etc. of Eatonton*, 80 Ga. 755, 757 (6 SE 602) (1888). We relied primarily on a leading constitutional law treatise for this proposition that a court "'will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who has, therefore, no interest in defeating it.'" Id. at 757 (quoting Thomas Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 197 (5th ed.) (1888)). By the turn of the century, we deemed it "a well-settled rule of law" that before "a law can be attacked by any citizen on the ground of its unconstitutionality, he must show that its enforcement is an infringement upon his rights of person or property." *Plumb v. Christie*, 103 Ga. 686, 692 (30 SE 759) (1898). Although the

42

separation of powers required us to refrain from deciding constitutional questions unnecessarily, a plaintiff satisfying an individualized standing requirement in raising a constitutional challenge presented a constitutional question that could not be avoided.[26] Without such individualized standing, however, the obligation to avoid unnecessary constitutional questions prevailed. We continued to apply our standing rule throughout the duration of the 1877 Constitution. See *Stegall v. Sw. Ga. Rgl. Hous. Auth.*, 197 Ga. 571, 583 (30 SE2d 196) (1944); *Webb v. City of Atlanta*, 186 Ga. 430, 444-445 (5) (198 SE 50) (1938); *Witherow v. Bd. of Drainage Commrs.*, 155 Ga. 476, 476 (117 SE 329) (1923); *Cooper v. Rollins*, 152 Ga. 588, 593 (110 SE 726) (1922); see also *Harrell v. Cane Growers' Co-op. Assn.*, 160 Ga. 30, 72 (126 SE 531) (1925) (Russell, C. J., concurring). Under the 1945 and 1976 Constitutions, we

---

[26] The United States Supreme Court appears to have adopted a similar approach over a century ago: "Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of Congress unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it." *Blair v. United States*, 250 U.S. 273, 279 (39 SCt 468, 63 LE 979) (1919).

consistently applied the same standing rule. See, e.g., *St. John's Melkite Catholic Church v. Commr. of Rev.*, 240 Ga. 733, 735 (3) (242 SE2d 108) (1978); *Northeast Factor & Discount Co. v. Jackson*, 223 Ga. 709, 711 (1) (157 SE2d 731) (1967); *S. Ga. Nat. Gas Co. v. Ga. Pub. Serv. Comm'n*, 214 Ga. 174, 175 (104 SE2d 97) (1958); *West v. Hous. Auth. of Atlanta*, 211 Ga. 133, 136 (84 SE2d 30) (1954).

We also have at least two contexts — taxes and voting — in which we accept a less-individualized kind of injury as satisfying this standing requirement. We have long held that taxpayers generally have standing to contest unlawful expenditures of public funds when they are "in danger of injury through loss of public funds or property." *Morris v. City Council of Augusta*, 201 Ga. 666, 670 (1) (40 SE2d 710) (1946) (distinguishing cases not allowing such suits as lacking that danger); see also, e.g., *Williams v. DeKalb County*, 308 Ga. 265, 272 (3) (b) (ii) & n.13 (840 SE2d 423) (2020). Similarly, we have held that taxpayers have standing to challenge unconstitutional tax exemptions, because of each taxpayer's particularized injury from another's unlawful exemption. See *Lowry*

44

*v. McDuffie*, 269 Ga. 202, 203-204 (1) (496 SE2d 727) (1998) ("Each taxpayer has an interest in seeing that no other taxpayer is illegally exempted from the payment of [a] tax. An illegal exemption places a greater tax burden upon those taxpayers being required to pay."). And we have long held that voters — by virtue of being voters — can have standing to constitutionally challenge election laws. Our rationale has been that "the denial of the right [to elect public officials] is such an injury to the *personal* right of any voter as would authorize him to attack the constitutionality of an act[.]" *Manning v. Upshaw*, 204 Ga. 324, 327 (2) (49 SE2d 874) (1948) (emphasis added); see also *Barrow v. Raffensperger*, 308 Ga. 660, 667 (2) (b) (842 SE2d 884) (2020) (citing *Manning*). Both of these contexts still require a showing of a kind of injury, even though that showing may be more relaxed than in other contexts.

To the extent that our standing injury requirement arises from our Constitution's Separation of Powers Provision, there's thus a

good argument that it was baked into the 1983 Constitution.[27] See

*Elliott v. State*, 305 Ga. 179, 181-182 (II) (824 SE2d 265) (2019).[28]

---

[27] The current text of our Separation of Powers Provision has been part of every Georgia Constitution since 1877. See Ga. Const. of 1983, Art. I, Sec. II, Par. III ("The legislative, judicial, and executive powers shall forever remain separate and distinct."); Ga. Const. of 1976, Art. I, Sec. II, Par. IV; Ga. Const. of 1945, Art. I, Sec. I, Par. XXIII; Ga. Const. of 1877, Art. I, Sec. I, Par. XXIII. And although expressed in different words, the underlying constitutional requirement that the powers of the three branches remain separate is as old as our State's independence from England. See Ga. Const. of 1861, Art. II, Sec. I, Par. I ("The Legislative, Executive and Judicial departments, shall be distinct . . . ."); Ga. Const. of 1798, Art. I, Sec. I ("The legislative, executive, and judiciary departments of Government shall be distinct, and each department shall be confined to a separate body of magistracy . . . ."); Ga. Const. of 1789, Arts. I-III (separating three branches); Ga. Const. of 1777, Art. I ("The legislative, executive, and judiciary departments shall be separate and distinct, so that neither exercise the powers properly belonging to the other."); cf. 1776 R. & Reg. of Colony of Ga. 3d, 5th, & 7th (separating three branches).

[28] Whether this rule that arose in the context of constitutional challenges to statutes might extend more broadly is a question for another day. The Georgia Constitution vests only the "judicial power of the state" in Georgia's courts. Ga. Const. of 1983, Art. VI, Sec. I, Par. I. At least some of our case law suggests that this limits jurisdiction to cases with standing. See, e.g., *Jersawitz v. Eldridge*, 262 Ga. 19, 20 (413 SE2d 725) (1992) (holding "the existence of an actual controversy was necessary" before "judicial power" could be exercised, and concluding that trial court exceeded the judicial power by issuing an order interpreting a statute without a case or adversarial parties before it); *Gas-Light Co. of Augusta v. West*, 78 Ga. 318, 319 (1886) ("A judicial power extends to deciding, determining controversies which arise between persons and individuals according to law."). And we have questioned whether the General Assembly can grant Georgia courts jurisdiction over subject matter that is not "inherently judicial." See *Harris v. Sheffield*, 128 Ga. 299, 303 (57 SE 305) (1907). But as noted below, we also have long adjudicated cases involving public rights without applying the standing rules discussed here. See also *Jones v. Boone*, 297 Ga. 437, 439 (1) (774 SE2d 668) (2015) (noting longstanding

And given that we've often said a lack of standing deprives us of subject-matter jurisdiction — the power to decide a case — it would be odd for standing to have a sub-constitutional status. But our case law lacks clarity on this point.

2.   *At least some claims expressly do not require standing.*

While the standing prerequisite for constitutional challenges to statutes dates back to the 1800s, so too does a line of cases expressly disclaiming such a requirement. Apparently beginning in 1897, we have consistently held that citizens and taxpayers may sue government officials to enforce publicly owed legal duties, and to contest their ultra vires act. This line appears to have its origins in *Keen v. Mayor & Council of Waycross*, 101 Ga. 588 (29 SE 42) (1897). There, citing only treatises, we held that

> taxpayers may enjoin municipal corporations and their officers from transcending their lawful powers or

precedent that quo warranto action challenging right to public office may be brought by local resident or taxpayer). It seems to me that an effort to root standing principles in the limited nature of "the judicial power" that is vested in Georgia courts, if applied to all cases to which the judicial power extends, could be difficult to square with our well-established public rights precedents. But no such argument is present in this case, and so I reserve any conclusion on that point.

violating their legal duties in any mode which will injure the taxpayers, — such as making an unauthorized appropriation of the corporate funds, or an illegal disposition of the corporate property.

Id. at 592 (citation and punctuation omitted). Framed slightly differently,

any property-holder or municipal taxpayer may resort to equity to prevent municipal corporations or officials from exceeding their lawful powers or neglecting or violating their legal duties, under any circumstances where the taxpayer's interest will be injuriously affected.

Id. at 592-593. We noted that this "privilege of the taxpayer" was not a matter of statute. Id. at 593. And we explained that this rule was the same as the rule for shareholders of private companies, who can assert the rights of the corporation against the corporation's directors and officers through derivative litigation. Id. Incongruously, we also quoted a treatise extending the rule to actions against "county, town, or city authorities[.]" Id. (quoting 1 Pom. Eq. Jur. § 260, pp. 347, 348).

By the adoption of the 1933 Code, the rule was codified in statute in what is now OCGA § 9-6-24. And the more than 120 years since *Keen* have seen us apply this rule in all sorts of contexts, both

48

municipal and beyond: cities, counties, school boards, hospital authorities, etc. See, e.g., *Rothschild II v. Columbus Consol. Govt.*, 285 Ga. 477, 479 (678 SE2d 76) (2009) (county); *Tift County Hosp. Auth. v. MRS of Tifton, Inc.*, 255 Ga. 164, 165 (1) (335 SE2d 546) (1985) (hospital authority); *League of Women Voters of Atlanta-Fulton County, Inc. v. City of Atlanta*, 245 Ga. 301, 303 (1) (264 SE2d 859) (1980) (city); *Stephens v. Moran*, 221 Ga. 4, 5 (1) (142 SE2d 845) (1965) (city); *Floyd v. Thomas*, 211 Ga. 656, 656 (1) (87 SE2d 846) (1955) (county commissioners); *Irwin v. Crawford*, 210 Ga. 222, 224 (78 SE2d 609) (1953) (county board of education); *Colston v. Hutchinson*, 208 Ga. 559, 561 (67 SE2d 763) (1951) (same); *Smith v. McMichael*, 203 Ga. 74, 74 (1) (45 SE2d 431) (1947) (county commissioners); *Thomas v. Ragsdale*, 188 Ga. 238, 239-240 (1) (3 SE2d 567) (1939) (same); *Atlanta Title & Trust Co. v. Tidwell*, 173 Ga. 499, 507-508 (1) (160 SE 620) (1931) (superior court clerk); *Plainfield Consol. Sch. Dist. v. Cook*, 173 Ga. 447, 448 (1) (160 SE 617) (1931) (school board); *Bd. of Comm'rs of City of Manchester v. Montgomery*, 170 Ga. 361, 366 (2) (153 SE 34) (1930) (city);

*McGinnis v. McKinnon*, 165 Ga. 713, 713 (1) (141 SE 910) (1928) (county commissioners).

A small handful of decisions have even applied the public-rights rule to relieve the necessity for individualized standing in suits against state officials. See, e.g., *Villyard v. Regents of Univ. Sys. of Ga.*, 204 Ga. 517, 522-523 (50 SE2d 313) (1948) (rejecting equal protection challenge for lack of standing but considering same petitioners' constitutional challenge based on other provisions); *Bankers' Savings & Loan Co. v. Better Bus. Div. of Atlanta Chamber of Commerce*, 177 Ga. 334, 335-337 (170 SE 291) (1933) (holding public-rights rule sufficient to provide standing for suit to compel state banking superintendent to regulate particular entity). And at least one decision applied this rule to allow a challenge to local legislation enacted by the General Assembly without acknowledging our case law requiring individualized standing to challenge statutes. See *Smith*, 203 Ga. at 74-75 (1). It is not obvious that all of these cases can be reconciled into a coherent framework. I certainly do not

purport to do so here.[29]

3. *Without clearly identifying the source and nature of Georgia's standing requirements, we should be very hesitant to rely on federal precedents.*

We often rely on decisions of federal courts or sister states when we find them persuasive on a Georgia law question. But such foreign decisions "generally will prove persuasive only to the extent" that the foreign courts "actually were guided by th[e] same language, history, and context" as the Georgia law at issue. *Elliott*, 305 Ga. at 188 (II) (C). It is not possible to determine how persuasive we should find federal standing precedents when we have not identified clearly the Georgia authority from which our standing requirements arise.

It does seem to me that the most basic part of federal standing

---

[29] This case law also seems fundamentally inconsistent with Justice Thomas's description of the common law as placing a higher burden for showing injury on a plaintiff seeking to vindicate a public right than existed for a plaintiff seeking to vindicate only a private right against a private party. See *Spokeo, Inc. v. Robins*, 578 U.S. 330, 343-346 (136 SCt 1540, 194 LE2d 635) (2016) (Thomas, J., concurring). Of course, the common law of England as of 1777 is the law of Georgia except to the extent it has been displaced by the constitution or a statute. See OCGA § 1-1-10 (c) (1). But our precedent long ago took another path.

doctrine is a useful framework for thinking about Georgia standing in cases that require it. In *Lujan*, the United States Supreme Court articulated three longstanding building blocks of standing: injury in fact (i.e., the plaintiff has suffered an actual, concrete injury), causation (that injury was caused by and traceable to the wrong the plaintiff challenges), and redressability (it is possible to remedy the injury through court action). See *Lujan*, 504 U.S. at 560-561. That three-part formulation makes sense when we consider the principle we have applied in our standing cases. We have required a party to have a concrete and particularized interest in stopping a statute from being applied to it. See, e.g., *Northeast Factor & Discount Co.*, 223 Ga. at 710 (1) ("An attack made upon the constitutionality of an Act of the General Assembly to be valid must be made by a party whose rights are affected and who therefore has an interest in such Act."); *Webb*, 186 Ga. at 444-445 (5) ("[T]he general law and special law above referred to would have no application to the petitioners, and they could not be injuriously affected by the application and enforcement of the special law. Therefore they could not attack its

constitutionality; and under the above rulings this court will not pass upon such attack."); *Plumb*, 103 Ga. at 692. Similarly, if an injury was not *caused* by the challenged statute, then the party — injured or not — has had no interest in challenging it. See, e.g., *Reid*, 80 Ga. at 757 (observing that we could not "see what right" plaintiff had to file suit, as he did not "allege any injury accruing to him by the enforcement of the act"). And the same logic holds true if holding a statute unconstitutional would not *redress* the claimed injury. Accordingly, those federal principles, at their most basic, do not appear to be inconsistent with Georgia standing law.

But over time, the federal courts have developed a complex web of applications of and exceptions to the standing doctrine. Before we rely upon such federal decisions, we ought to be confident that they are consistent with Georgia standing law. See, e.g., *Elliott*, 305 Ga. at 187-189 (II) (C) (federal interpretations of the federal constitution generally will prove persuasive in interpreting equivalent state provisions "only to the extent that the [federal] decisions actually were guided by [the] language, history, and context" of the state

legal provision at issue). Unless and until we can explain the source and nature of Georgia standing requirements, it will be difficult at best to achieve such confidence in most cases.

I am authorized to state that Justice Warren joins in this concurrence.

Decided March 8, 2022.

Standing; constitutional question. Richmond Superior Court. Before Judge Grubbs, Senior Judge.

*Hunter Rhodes, Joseph T. Rhodes, Samuel A. Emas*, for Black Voters Matter Fund, Inc.

*Tucker Long, Thomas W. Tucker, John B. Long*, for Saunders.

*Christopher M. Carr, Attorney General, Bryan K. Webb, Deputy Attorney General, Russell D. Willard, Senior Assistant Attorney General, Lee M. Stoy, Jr., Josh Belinfante, Vincent R. Russo, Javier Pico-Prats, Holly A. Pierson, Assistant Attorneys General; Wayne Brown, Samuel E. Meller; Hull Barrett, William J. Keogh III, George R. Hall, James C. Driver; Fleming & Nelson, Barry A. Fleming, F. Adam Nelson, P. Simon P. Williams*, for Kemp et al.